IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

DESERT PALM SURGICAL GROUP, P.L.C., an Arizona professional limited liability company; and ALBERT E. CARLOTTI and MICHELLE L. CABRET-CARLOTTI, husband and wife, *Plaintiffs/Appellees*,

*v.*

SHERRY PETTA, an individual, *Defendant/Appellant*.

No. 1 CA-CV 13-0376

FILED 1-15-2015

Appeal from the Superior Court in Maricopa County
No. CV2008-010464
The Honorable Mark H. Brain, Judge

**AFFIRMED IN PART; REVERSED IN PART; VACATED AND REMANDED**

COUNSEL

Kelly McCoy, P.L.C., Phoenix
By Matthew J. Kelly, Kevin C. McCoy
*Counsel for Plaintiffs/Appellees*

Clark Hill P.L.C., Scottsdale
By Ryan J. Lorenz, Sean M. Caroll
*Counsel for Defendant/Appellant*

**OPINION**

Presiding Judge Lawrence F. Winthrop delivered the opinion of the Court, in which Judge John C. Gemmill and Chief Judge Diane M. Johnsen joined.

**W I N T H R O P,** Associate Presiding Judge:

¶1        Sherry Petta appeals the superior court's judgment in the amount of $12,009,489.96 in favor of Desert Palm Surgical Group, P.L.C. ("DPSG"), Dr. Albert E. Carlotti, and Dr. Michelle L. Cabret-Carlotti (collectively, "Plaintiffs") on claims for defamation and false light invasion of privacy.  In this opinion, we affirm the superior court's denial of Petta's motions for judgment as a matter of law, but vacate the judgment and remand for a new trial because the judgment cannot be supported by the damages evidence presented and shocks the conscience of this court.  We also reverse the superior court's summary judgment on Petta's counterclaim for medical battery, a claim that may be tried on remand.

## FACTS AND PROCEDURAL HISTORY[1]

¶2        Drs. Carlotti and Cabret-Carlotti (collectively, "the Doctors") are husband and wife with dental and medical degrees who operate DPSG, an Arizona professional limited liability company formed in 2002. Plaintiffs' practice offers a wide range of services, including maxillofacial surgery, cosmetic surgery, dental procedures, and various skin procedures and treatments.

¶3        In January 2007, Dr. Carlotti performed cosmetic surgery on Petta's nose and eyelids, and Dr. Cabret-Carlotti performed laser resurfacing treatments on Petta's face.  Petta was dissatisfied with the results, and aggressively voiced her dissatisfaction to the Doctors and their staff on numerous occasions.  In Petta's view, the laser procedure had burned and scarred her face.  Without question, healing was delayed, persistent post-operative infection occurred, and Petta's nose developed residual thickening due to scar tissue.  Throughout 2007, the Doctors attempted to improve Petta's healing and appearance with various treatments, but the doctor-patient relationship deteriorated.

¶4        Petta eventually consulted physicians not associated with DPSG and underwent other treatment on her face; the parties disputed whether the Doctors had authorized her to do so.  By September 2007, Dr. Carlotti refused to continue Petta's care for a period of time, ostensibly due to Petta's "screaming and using profanity" and her reliance on

---

[1]      We view the facts and inferences in the light most favorable to sustaining the verdict and judgment.  *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 123, 907 P.2d 506, 509 (App. 1995).

"unauthorized care."  On September 25, 2007, Dr. Carlotti presented Petta with the following agreement, which both he and Petta signed:

> Desert Palm Surgical Group agrees to perform 3 IPL [intense pulse light] treatments of the forehead and periorbital areas, provided that there is <u>absolutely no intervention by any unauthorized doctor, nurse or esthetician of any type during the course of treatment.</u>  This includes medications, products and treatments.  In addition, treatment intervals will be clearly defined to which the patient must comply completely.  Lastly, if there is any profanity, screaming or threats made now or in the future, to either Drs. Carlotti or any staff member, you will be dismissed as a patient from Desert Palm Surgical Group.

In the fall of 2007, the IPL treatments proceeded as planned, and Petta's face improved.

¶5        On January 3, 2008, Dr. Carlotti performed at cost a second surgery (a "revision nasal tip surgery") to remove the scar tissue on Petta's nose.  Petta remained dissatisfied, in part because, as she alleged, the doctor had now shortened and curved her nose upward, without her permission and against her express wishes.  On February 1, 2008, Petta consulted a different physician, Dr. Ronald J. Caniglia, who opined that Petta's nose had "been shortened quite a bit" and that it appeared there was "collapse in the left middle vault with a stepoff deformity there."

¶6        Petta eventually contacted the Arizona Medical Board ("AMB"), the Arizona State Board of Dental Examiners ("the Dental Board"), the Arizona Radiation Regulatory Agency ("ARRA"), and former DPSG employees and patients, and discovered the Doctors were not certified in plastic or cosmetic surgery, or maxillofacial surgery, by a certifying professional board recognized by the American Board of Medical Specialties ("ABMS").[2]  In early March 2008, Petta submitted a formal

---

[2]        The AMB does not itself issue board certification, but allows its licensees to report on its consumer website if they are certified as a specialist by a member of the ABMS.  The Doctors are not board certified by any of the member boards of the ABMS, but are instead certified by the American Board of Oral & Maxillofacial Surgery ("ABOMS"), a separate organization not so recognized by the AMB or the ABMS.

complaint against the Doctors to the AMB, alleging they had operated on her nose beyond the scope of her consent.[3]

¶7         At about the same time, Petta requested copies of her medical records, and although she paid for a copy of those documents, a disagreement arose over Plaintiffs' delivery of those records.  On March 24, 2008, Petta called DPSG to inquire about the status of her request, and she was informed her records were ready to be picked up.  When she arrived at DPSG, however, she was informed the records were not available.  A heated verbal exchange followed, with Petta purportedly shouting profanity-laced warnings to other patients present not to allow the Doctors to practice on them, and Scottsdale police were called.  Dr. Carlotti refused to provide Petta with her records because she had filed a complaint with the AMB.   A police officer spoke telephonically with an AMB representative, who informed the officer that DPSG could not withhold Petta's records on that basis.  The officer relayed the information to Dr. Carlotti, who agreed to provide the records to Petta by the end of the day.[4] Later that day, with the assistance of law enforcement, Petta received her medical records, which she later maintained had been altered.[5]  Also on March 24, at Dr. Carlotti's behest, the police issued Petta a trespass warning. On March 26, 2008, Dr. Carlotti sought an injunction against harassment against Petta, which was issued after an evidentiary hearing.

¶8         In the next few weeks, Petta began posting statements on various consumer review websites, complaining of her experiences as the Doctors' patient, including alleging the Doctors were not "board certified." She also created her own website complaining she had been Plaintiffs' "victim" and warning the public of the Doctors' alleged incompetence and

---

[3]       That complaint was ultimately dismissed by the AMB.

[4]       At trial, Dr. Carlotti denied Petta's complaint with the AMB was the basis for his refusal to provide Petta with her records, but he acknowledged a representative of the AMB advised him telephonically to "just give her her records."

[5]       Petta contacted a former DPSG employee, who replied with an e-mail that appeared to confirm Petta's suspicion that some chart documentation the former employee had authored had been altered.

unethical, unprofessional behavior.[6]  In late April and early May 2008, Plaintiffs sent two letters through counsel to Petta demanding she "remove all defamatory and baseless statements from any and all websites" and advising her that if she did not, Plaintiffs would sue her.

¶9        On May 7, 2008, Plaintiffs filed a complaint against Petta, alleging she had posted false and defamatory statements about Plaintiffs in her internet postings, omitted facts, and disparaged Plaintiffs while painting them in a false light.  Through their complaint, Plaintiffs asserted claims for (1) defamation/libel per se, (2) tortious interference with medical practice, (3) injurious falsehood/business disparagement, and (4) false light invasion of privacy.  That same day, Plaintiffs also requested an application for a temporary restraining order ("TRO") and preliminary injunction to compel Petta to remove any postings from websites in which Petta had complained about the Doctors' surgical work and other matters and to enjoin her from continuing to post allegedly false statements on those websites.  On May 22, 2008, Petta through counsel stipulated to the relief sought in the TRO, and the superior court entered the TRO.  Petta removed her comments approximately one month after they had been posted.[7]

¶10        Petta filed an answer and asserted a counterclaim for medical battery, claiming she had not consented to the scope of the January 2008 alteration to her nose.[8]  On January 8, 2010, Plaintiffs filed an amended

---

[6]    After the hearing on the injunction against harassment, Petta modified her online comments to clarify she was "not disputing" Dr. Carlotti was certified by the ABOMS, but continued to maintain that "neither doctor is state Board Certified" based on information she received directly from the AMB staff and its website.  She also provided a link directing viewers to the AMB website.

[7]    On November 17, 2008, however, a different judge of the superior court, addressing a flurry of motions filed by the parties, issued a follow-up minute entry denying Plaintiffs' application for a TRO.  Apparently relying on this ruling, Petta resumed posting complaints about Plaintiffs to "doctor rating" websites in December 2008, and Plaintiffs filed a motion for contempt and sanctions for violation of the TRO.  On February 11, 2009, the court reaffirmed the TRO, and Petta again removed the comments.

[8]    In the meantime, the parties' respective antagonism escalated.  Petta continued to file numerous complaints about the Doctors with the AMB, contending in part they had falsified records, Dr. Carlotti was "messed up

complaint, adding several of their former employees and the mother of a former employee as defendants.[9]   The additional defendants were all eventually dismissed with prejudice, ostensibly as the result of negotiated settlements containing confidentiality clauses.

¶11    Before trial, Petta moved for summary judgment on each of Plaintiffs' claims.  Plaintiffs moved for summary judgment on Petta's counterclaim, arguing Petta had consented to the January 2008 procedure on her nose (the revision nasal tip surgery) and, in any event, Petta could not prove which of the Doctors had performed the surgery.  The superior court granted Petta's motions for summary judgment as to Plaintiffs' claims for injurious falsehood/business disparagement and wrongful interference with business relations, and Plaintiffs' motion for summary judgment as to Petta's counterclaim for medical battery.

¶12    Plaintiffs' remaining claims for defamation and false light invasion of privacy were tried.  After a ten-day trial, the jury returned a verdict in favor of Plaintiffs and against Petta in the amount of eleven million dollars in actual or compensatory damages and one million dollars in punitive damages on Plaintiffs' claims for defamation and false light invasion of privacy.[10]  The superior court entered a final judgment on the verdict.

---

on narcotics," and the Doctors were using a laser not in compliance with ARRA regulations.  (Plaintiffs were in fact assessed civil fines for non-compliance with the ARRA.)  Also, Petta complained about Dr. Cabret-Carlottii to the Dental Board.  Meanwhile, in August 2008, after Petta presented evidence to the AMB regarding Plaintiffs' alleged lack of proper licensing and lack of proof of maintenance of the laser equipment, Dr. Cabret-Carlotti sent Petta a series of personally insulting text messages, accusing Petta of being psychotic and blaming Petta for her post-operative complications.

[9]    During discovery, Petta became aware of numerous individuals, including Plaintiffs' former patients, employees, and business associates, who indicated a willingness to testify as to their poor results and/or Plaintiffs' lack of competence, unprofessional conduct, and bad reputation in the Scottsdale community.  Some or all of these individuals, assisted by Petta, also filed complaints about Plaintiffs with the AMB.

[10]    The jury was not asked to break out the amounts awarded for compensatory damages.

¶13　　　　Petta moved for a new trial, for judgment as a matter of law, for remittitur, and for relief from judgment. The superior court denied Petta's motions and denied Plaintiffs' request to impose a permanent injunction against Petta, but amended its judgment to correct an accrual of interest calculation. In the amended final judgment, the court found in favor of Plaintiffs in the amount of $12,009,489.96 (an amount that included costs), plus interest. Petta filed a timely notice of appeal.

**ANALYSIS**

*I.　　Jurisdiction*

¶14　　　　As an initial matter, Plaintiffs argue this court lacks jurisdiction because Petta failed to designate the amended final judgment in her notice of appeal. We disagree.

¶15　　　　"The timely filing of a valid notice of appeal is a prerequisite to the exercise of appellate jurisdiction." *Santee v. Mesa Airlines, Inc.*, 229 Ariz. 88, 89, ¶ 3, 270 P.3d 915, 916 (App. 2012) (citations omitted). As a general rule, our review is limited to matters designated in the notice of appeal or cross-appeal. *See Flory v. Silvercrest Indus., Inc.*, 129 Ariz. 574, 581-82, 633 P.2d 383, 390-91 (1981); ARCAP 8(c) ("The notice of appeal . . . shall designate the judgment or part thereof appealed from . . . ."). We have an independent duty to determine whether we have jurisdiction over an  appeal and must dismiss an appeal over which we lack jurisdiction. *Baker v. Bradley,* 231 Ariz. 475, 478-79, ¶ 8, 296 P.3d 1011, 1014-15 (App. 2013).

¶16　　　　Nevertheless, "where the record discloses an appellant's intent to appeal from a judgment, such as sending copies of a defective notice of appeal to all defendants, or where a notice of appeal substantially complies with  the Rules of Civil Appellate Procedure, the notice of appeal should be construed as sufficient so long as the defect has neither misled nor prejudiced an opposing party." *Hill v. City of Phoenix*, 193 Ariz. 570, 572-73, ¶ 10, 975 P.2d 700, 702-03 (1999) (citing *Hanen v. Willis*, 102 Ariz. 6, 9-10, 423 P.2d 95, 98-99 (1967) ("[W]e believe that distinction is not material, and that the better rule is that if a valid judgment has been entered in the case, a notice of appeal timely filed in relation to such judgment will not be found insufficient merely because the date given as that of the order or judgment appealed from is the date of an earlier rendering of the same judgment by minute entry order . . . .")).

¶17　　　　In this case, the superior court entered a signed final judgment resolving all claims and counterclaims on February 8, 2012.

Plaintiffs filed their motion to alter or amend the judgment, and Petta filed a timely motion for new trial, for judgment as a matter of law, and for remittitur. On May 1, 2013, the superior court's amended final judgment was filed, and the court's signed minute entry denying Petta's post-trial motions was filed the next day – on May 2, 2013. On May 16, 2013, Petta filed a timely notice of appeal "from the Judgment entered in this matter on February 8, 2012, and the order denying post-trial motions entered on or about May 1 or 2, 2013, and all parts of each."

**¶18**　　　Plaintiffs note that Petta's notice of appeal failed to designate the amended final judgment as the judgment from which she was appealing. Citing *Ball v. Chandler Improvement District No. 48*, 150 Ariz. 559, 724 P.2d 1228 (App. 1986), for the proposition that failure to identify the amended judgment results in a waiver, Plaintiffs argue we should dismiss for lack of jurisdiction. *See generally Swichtenberg v. Brimer*, 171 Ariz. 77, 82, 828 P.2d 1218, 1223 (App. 1991) ("Subject matter jurisdiction cannot be waived, and can be raised at any stage of the proceedings." (citation omitted)).

**¶19**　　　Plaintiffs' reliance on *Ball* is unavailing. In *Ball*, this court simply held that, because the City of Chandler had failed to appeal the underlying merits of a judgment and had only appealed from the award of attorneys' fees, the City could not launch a collateral attack on the judgment in the appeal. 150 Ariz. at 562-63, 828 P.2d at 1231-32. Here, the final judgment, the amended final judgment, and the superior court's order denying the post-trial motions (with the exception of Plaintiffs' motion to amend the award of interest) were all part of the same determination on the same claims. Further, Plaintiffs cannot argue they have been misled or prejudiced by Petta's notice of appeal. Accordingly, we have jurisdiction to decide the merits of Petta's appeal pursuant to Arizona Revised Statutes ("A.R.S.") section 12-2101(A)(1) and (5)(a) (West 2015).[11]

　　　　*II.　　　The Superior Court's Denial of Summary Judgment*

**¶20**　　　Petta argues the superior court erred in denying her motions for summary judgment as to Plaintiffs' claims for defamation and false light invasion of privacy because insufficient evidence of causation and damages existed to create a genuine issue of material fact. She premises her claim on the fact the superior court granted her motion for summary judgment on Plaintiffs' injurious falsehood/business disparagement claim for lack of

---

[11]　　　We cite the current version of all statutes unless changes material to our decision have occurred since the relevant dates.

provable damages, concluding that in the absence of such evidence, the jury "would be left to speculate regarding damages." The court also granted summary judgment on Plaintiffs' tortious interference with medical practice claim on the basis that Plaintiffs failed to "identify specific damages resulting from that interference." Petta argues the court's reasoning in dismissing those two claims must be applied to the defamation and false light invasion of privacy claims; otherwise, she submits, the court's conclusions are "contradictory." Plaintiffs argue Petta did not raise the sufficiency of causation or damages in her summary judgment motion and we should not review the superior court's denial of summary judgment on appeal.

¶21        "Generally, the denial of a summary judgment motion is not reviewable on appeal from a final judgment entered after a trial on the merits." *John C. Lincoln Hosp. & Health Corp. v. Maricopa Cnty.*, 208 Ariz. 532, 539, ¶ 19, 96 P.3d 530, 537 (App. 2004) (citing *Navajo Freight Lines, Inc. v. Liberty Mut. Ins. Co.*, 12 Ariz. App. 424, 428, 471 P.2d 309, 313 (1970)). That is because allowing appellate review of the superior court's denial of a summary judgment motion after a trial on the merits "could lead to the absurd result that one who has sustained his position after a full trial and a more complete presentation of the evidence might nevertheless be reversed on appeal because he had failed to prove his case more fully at the time of the hearing of the motion for summary judgment." *Navajo Freight Lines*, 12 Ariz. App. at 428, 471 P.2d at 313 (citations omitted).

¶22        An appellate court may, however, review a trial court's denial of summary judgment in a case that has gone to trial if the denial is based on a purely legal issue or if the proponent reasserts the issue in a Rule 50, Ariz. R. Civ. P., motion for judgment as a matter of law or other post-trial motion. *John C. Lincoln Hosp.*, 208 Ariz. at 539, ¶ 19, 96 P.3d at 537; *Hauskins v. McGillicuddy*, 175 Ariz. 42, 49, 852 P.2d 1226, 1233 (App. 1992). "A purely legal issue or question is one that does not require the determination of any predicate facts, namely, 'the facts are not merely undisputed but immaterial.'" *John C. Lincoln Hosp.*, 208 Ariz. at 539 n.5, ¶ 19, 96 P.3d at 537 n.5 (quoting *Seidel v. Times Ins. Co.*, 970 P.2d 255, 257 (Or. Ct. App. 1998)). We review *de novo* whether a pure question of law precluded the denial of summary judgment. *See Hourani v. Benson Hosp.*, 211 Ariz. 427, 430, ¶ 4, 122 P.3d 6, 9 (App. 2005).

¶23        In this case, the issue raised by Petta is not a purely legal issue. Rather, it requires this court to review and assess predicate facts. *See Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 12, 86 P.3d 954, 958 (App. 2004) ("Causation is generally a question of fact for the jury unless reasonable persons could

not conclude that a plaintiff had proved this element." (citation omitted)). Moreover, Petta's motions for summary judgment regarding defamation and false light invasion of privacy were based primarily on her defense of truth; she did not argue lack of causation or damages. Further, although Petta also moved during trial for judgment as a matter of law pursuant to Rule 50, she again did not raise the issue of causation or damages; instead, she once more focused her argument on her contention that her statements were true or simply a matter of opinion.[12] It was not the superior court's obligation to search the record for facts that might support Petta's motion for summary judgment. *See, e.g., Mast v. Standard Oil Co. of Cal.*, 140 Ariz. 1, 2, 680 P.2d 137, 138 (1984). Additionally, no inherent contradiction exists in the superior court's rulings. Petta did not put the issue of causation and damages before the court in her motions for summary judgment, and even if she had done so, the court could have concluded Plaintiffs' defamation and false light invasion of privacy claims could be supported by their evidence of general damages.[13] We see no reason to further examine the superior court's rulings denying Petta's motions for summary judgment on the defamation and false light invasion of privacy claims.

### III. *The Claims for Defamation and False Light Invasion of Privacy*

¶24 Petta contends Plaintiffs' claims for defamation and false light invasion of privacy were not supported by the evidence at trial because her

---

[12] Petta did, however, raise the issues of insufficient causation and damages in her post-judgment motions for new trial, judgment as a matter of law, and remittitur.

[13] Actual or compensatory damages may consist of general and/or special damages. "General damages are such as the law implies and presumes to have occurred from the wrong complained of, while special damages are those which are the natural but not the necessary consequence of the act complained of and usually stem from the particular circumstances of the case." *S. Ariz. Sch. For Boys, Inc. v. Chery*, 119 Ariz. 277, 280, 580 P.2d 738, 741 (App. 1978) (citations omitted). In tort cases, such as those involving defamation and false light invasion of privacy, general damages cover a plaintiff's loss of reputation, shame, mortification, injury to the feelings, and the like, whereas special damages are limited to the plaintiff's actual pecuniary loss, which must be specially pleaded and proved. *F.A.A. v. Cooper*, 132 S. Ct. 1441, 1451 (2012) (citation omitted).

statements about Plaintiffs either were truthful or constituted matters of opinion, and insufficient evidence of causation and damages existed. She maintains the superior court therefore erred in denying her motions for judgment as a matter of law.[14]

**¶25** We review *de novo* the denial of a motion for judgment as a matter of law. *Goodman v. Physical Res. Eng'g, Inc.*, 229 Ariz. 25, 27-28, ¶ 6, 270 P.3d 852, 854-55 (App. 2011); *A Tumbling-T Ranches v. Flood Control Dist. of Maricopa Cnty.*, 222 Ariz. 515, 524, ¶ 14, 217 P.3d 1220, 1229 (App. 2009). Such a motion should be granted "if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *A Tumbling-T Ranches*, 222 Ariz. at 524, ¶ 14, 217 P.3d at 1229 (quoting *Orme Sch. v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990)). "In making this determination, we view 'the evidence in a light most favorable to upholding the jury verdict,' and will affirm 'if any substantial evidence exists permitting reasonable persons to reach such a result.'" *Id.* (quoting *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998)).

**¶26** "Defamation is a common law action based upon a tortious invasion of one's interest in his or her reputation." *Boswell v. Phoenix Newspapers, Inc.*, 152 Ariz. 1, 5, 730 P.2d 178, 182 (App. 1985) (citations omitted). Arizona follows the Restatement (Second) of Torts (1977) ("Restatement") on claims relating to defamation of a private person. *Peagler v. Phoenix Newspapers, Inc.*, 114 Ariz. 309, 315, 560 P.2d 1216, 1222 (1977). "One who publishes a false and defamatory communication concerning a private person, or concerning a public official or public figure

---

14      Plaintiffs argue that, because Petta failed to move for judgment as a matter of law pursuant to Rule 50 on the grounds that Plaintiffs did not present any evidence of causation and damages prior to the case being submitted to the jury, Petta has waived any entitlement to judgment as a matter of law on those bases. *See Cnty. of La Paz v. Yakima Compost Co.*, 224 Ariz. 590, 607, ¶ 51, 233 P.3d 1169, 1186 (App. 2010). Nevertheless, "the rule that issues not objected to at trial are waived is procedural, not jurisdictional, and we may suspend it at our discretion." *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 39, 945 P.2d 317, 350 (App. 1996) (citations omitted); *see also Stokes v. Stokes*, 143 Ariz. 590, 592, 694 P.2d 1204, 1206 (App. 1984) (recognizing that "[the rule] an appealing party may not urge as grounds for reversal a theory which he failed to present below . . . is procedural and not jurisdictional") (citations omitted).

in relation to a purely private matter . . . , is subject to liability, if, but only if, he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement § 580B. Negligence is conduct that creates an unreasonable risk of harm and the failure to use that amount of care a reasonably prudent person would use under similar circumstances. *Peagler*, 114 Ariz. at 315, 560 P.2d at 1222.

¶27 Substantial truth of an allegedly defamatory statement may provide an absolute defense to an action for defamation. *See Fendler v. Phoenix Newspapers, Inc.*, 130 Ariz. 475, 479-80, 636 P.2d 1257, 1261-62 (App. 1981). If the underlying facts are undisputed, the court may determine the question of substantial truth as a matter of law. *Id*. at 480, 636 P.2d at 1262. A slight inaccuracy of expression is immaterial if the alleged defamatory statement is true in substance. *Heuisler v. Phoenix Newspapers, Inc.*, 168 Ariz. 278, 285 n.4, 812 P.2d 1096, 1103 n.4 (App. 1991). Also, a technically false statement may nonetheless be considered substantially true if, viewed "through the eyes of the average reader," the statement differs from the truth "only in insignificant details." *Currier v. W. Newspapers, Inc.*, 175 Ariz. 290, 293, 855 P.2d 1351, 1354 (1993) (quoting *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1073 (5th Cir. 1987)).

¶28 In *Yetman v. English*, 168 Ariz. 71, 811 P.2d 323 (1991), our supreme court set forth the test to determine when statements are actionable as defamation. That test may be summarized as follows:

> Statements that can be interpreted as nothing more than rhetorical political invective, opinion, or hyperbole are protected speech, but false assertions that state or imply a factual accusation may be actionable. The trial court first decides whether, under all the circumstances, a statement is even capable of a defamatory meaning. If so found, the jury then determines whether the defamatory meaning was actually conveyed. In most instances, it is for the jury to determine whether an ordinary reader or listener would believe the statement to be a factual assertion, mere opinion or hyperbole. The meaning of words and statements should not be construed in isolation; rather, consideration should be given to the context and all surrounding circumstances, including the impression created by the words used and the expression's general tenor. If the jury finds that a defamatory statement of objective fact (beyond mere hyperbole) exists, it should then consider actual damage to [the plaintiff's]

reputation in the real world by measuring the defamatory aspect of [the statement] by its natural and probable effect on the mind of the average recipient.

*Burns v. Davis*, 196 Ariz. 155, 165, ¶ 39, 993 P.2d 1119, 1129 (App. 1999) (internal citations and quotations omitted) (citing *Yetman*, 168 Ariz. at 76-79, 811 P.2d at 328-31).[15]

¶29        False light invasion of privacy is recognized in Arizona as a tort separate from defamation. *See Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 340, 783 P.2d 781, 786 (1989). The distinction between defamation and false light invasion of privacy is, however, subtle. *Id*. To establish a claim for false light invasion of privacy, a plaintiff must show (1) the defendant, with knowledge of falsity or reckless disregard for the truth, gave publicity to information placing the plaintiff in a false light, and (2) the false light in which the plaintiff was placed would be highly offensive to a reasonable person in the plaintiff's position. *Id*. at 338, 340, 783 P.2d at 784, 786 (quoting Restatement § 652E). Although a cause of action for false light invasion of privacy may arise when someone publishes something untrue about a person, in some instances, even a true statement may form the basis for false light liability if it creates a false implication about the person. *See id*. at 341, 783 P.2d at 787 ("[T]he false innuendo created by the highly offensive presentation of a true fact constitutes the injury." (citing Restatement § 652E)).

¶30        In this case, the superior court did not err in denying Petta's motions for judgment as a matter of law. Legitimate questions of fact existed as to both the defamation and false light invasion of privacy claims. The parties hotly contested whether Petta's statements were true, and

---

[15]        The United States Supreme Court has determined that "in cases raising First Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17 (1990) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 284–286 (1964))). "The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law." *Id*. (quoting *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989)).

although the jury could have found that some of Petta's statements about Plaintiffs were either true or substantially true, or constituted matters of opinion or hyperbole, it also could have found (and obviously did find) that at least some of Petta's statements conveyed a defamatory meaning and/or painted Plaintiffs in a false light.[16] *See Burns*, 196 Ariz. at 165, ¶ 39, 993 P.2d at 1129; *Godbehere*, 162 Ariz. at 338, 783 P.2d at 784. The jury was in the best position to resolve these material questions of fact. Further, once the jury found Petta's statements were defamatory or constituted a false light tort, it was within the jury's province to consider any actual damage to Plaintiffs' reputations and/or any emotional damage or damage to sensibility. *See Burns*, 196 Ariz. at 165, ¶ 39, 993 P.2d at 1129; *Godbehere*, 162 Ariz. at 340, 783 P.2d at 786.

### IV. *Petta's Statements to Government Agencies and Officials*

**¶31** Petta argues her statements to government administrative agencies, such as the AMB, and her statements to government officials, such as the Arizona Ombudsman - Citizens' Aide, were privileged and therefore could not be actionable. We find no error.

**¶32** At common law, an absolute privilege existed for those reporting professional misconduct to administrative agencies. *See Advanced Cardiac Specialists, Chartered v. Tri-City Cardiology Consultants, P.C.*, 222 Ariz. 383, 386, ¶ 7, 214 P.3d 1024, 1027 (App. 2009); *Drummond v. Stahl*, 127 Ariz. 122, 125-26, 618 P.2d 616, 619-20 (App. 1980). By statute, "[a]ny person or entity that reports or provides information to the [AMB] in good faith is not subject to an action for civil damages." A.R.S. § 32-1451(A). Under § 32-1451(A), regarding complaints to the AMB, "the common-law absolute privilege has been fully abrogated in favor of a qualified privilege for those acting 'in good faith.'" *Advanced Cardiac Specialists*, 222 Ariz. at 387, ¶ 11, 214 P.3d at 1028. "A conditional privilege is abused and forfeited when a defendant acts with malice in fact." *Hirsch v. Cooper*, 153 Ariz. 454, 458, 737 P.2d 1092, 1096 (App. 1986) (citation omitted), *disapproved on other grounds by Godbehere*, 162 Ariz. at 339 n.1, 783 P.2d at 785 n.1. "An abuse

---

[16] The superior court recognized this fact before trial when, in denying Petta's motion for summary judgment as to Plaintiffs' defamation claim, the court noted that "many of [the Doctors'] claimed defamatory statements appear questionable (and probably not actionable). The record supports, however, *at least* the notion that Petta published a statement that Dr. Carlotti was 'messed up on narcotics treating patients.'" (Emphasis in original.) Moreover, even if truthful, some of Petta's statements might have painted Plaintiffs in a false light.

through 'actual malice' occurs when the defendant makes a statement knowing its falsity or actually entertaining doubts about its truth." *Advanced Cardiac Specialists*, 222 Ariz. at 388, ¶ 14, 214 P.3d at 1029. To take a matter outside the scope of this qualified privilege, a plaintiff must prove by clear and convincing evidence the speaker abused the privilege. *Id*. at 387, ¶ 13, 214 P.3d at 1028.

¶33          No question exists that Petta's statements to the AMB and other agencies were made within the ambit of a qualified privilege. *See* A.R.S. § 32-1451; *Advanced Cardiac Specialists*, 222 Ariz. at 387, ¶¶ 11-12, 214 P.3d at 1028. Further, Petta claimed, and the jury was instructed without objection on, both qualified privilege with regard to her reports to the AMB and Dental Board and absolute privilege with regard to her statements to government officials.[17]  Nevertheless, the question whether Petta abused her qualified privilege for filing complaints with the AMB involved a factual determination about her motivations, especially in light of her persistent serial complaints against Plaintiffs. Petta contended she did not act out of spite or to ruin Plaintiffs' reputations or to injure their business. Plaintiffs, however, offered evidence Petta abused her qualified privilege, and the jury could have concluded Plaintiffs met their burden of proving Petta's statements to the AMB and other agencies were made with malice – that is, were knowingly false or made while entertaining doubts of their truth. *Advanced Cardiac Specialists*, 222 Ariz. at 388, ¶ 14, 214 P.3d at 1029. We presume the jury followed the superior court's instructions. *See Wendland v. AdobeAir, Inc.*, 223 Ariz. 199, 207, ¶ 28, 221 P.3d 390, 398 (App. 2009).

¶34          Furthermore, because the jury was not provided special interrogatories or special verdict forms for each damage component, we cannot determine whether the jury held Petta liable for defamation and/or false light invasion of privacy in connection with her statements to the AMB, other agencies, and/or government officials. *See Murcott v. Best W. Int'l, Inc.*, 198 Ariz. 349, 361, ¶¶ 64, 66, 9 P.3d 1088, 1100 (App. 2000)

---

[17]          With regard to other government officials, the court instructed the jury without objection that, although Petta could not be held liable for complaining to government officials, the jury could "consider the underlying substance of the statements made as evidence of [Petta's] motive and intent regarding actionable acts under these instructions, including whether [Petta] acted with an evil mind, intended to cause injury, or was motivated by spite or ill will, as set forth in the instruction on punitive damages."

(recognizing this court will "uphold a general verdict if evidence on any one count, issue, or theory sustains the verdict" (citations omitted)).

## V. Denial of Petta's Motion for New Trial or Remittitur

¶35 Compensatory or actual damages in tort cases provide compensation for a plaintiff's injury caused by a defendant's wrongful conduct. *See State v. Griswold*, 8 Ariz. App. 361, 364, 446 P.2d 467, 470 (1968); *U.S. Fid. & Guar. Co. v. Davis*, 3 Ariz. App. 259, 262-63, 413 P.2d 590, 593-94 (1966).

¶36 Petta argues the superior court erred in denying her motion for new trial or remittitur because the actual damages awarded were excessive. In considering Petta's motion, the superior court agreed with Petta that the verdict "was on the high side, bigger than I expected," and noted "[t]he real question in my mind is to go back again and look and see whether we ought to do something because the numbers are that high." After finding Petta had raised a "colorable issue" whether the actual damages awarded were excessive and unsupported by the evidence, the court nonetheless denied Petta's motion. We agree with Petta that, on this record, the damages awarded were wholly excessive and unsupported by the evidence.

¶37 We review for an abuse of discretion the superior court's denial of a motion for new trial or remittitur. *Monaco v. HealthPartners of S. Ariz.*, 196 Ariz. 299, 304, ¶ 13, 995 P.2d 735, 740 (App. 1999); *Mammo v. State*, 138 Ariz. 528, 532, 675 P.2d 1347, 1351 (App. 1983).

¶38 "A remittitur is a device for reducing an excessive verdict to the realm of reason." *Muccilli v. Huff's Boys' Store, Inc.*, 12 Ariz. App. 584, 590, 473 P.2d 786, 792 (1970). Remittitur should be ordered only for the most cogent reasons, such as a lack of evidence supporting the damages awarded. *Yakima Compost Co.*, 224 Ariz. at 607, ¶ 52, 233 P.3d at 1186 (citations omitted). Nevertheless, if a verdict is so unfair, unreasonable, and outrageous as to shock the conscience of the court, or is plainly the product of passion, prejudice, mistake, or disregard of the evidence, a court may grant a remittitur or a new trial. *See Haralson v. Fisher Surveying, Inc.*, 201 Ariz. 1, 6, ¶ 21, 31 P.3d 114, 119 (2001); *Acheson v. Shafter*, 107 Ariz. 576, 579, 490 P.2d 832, 835 (1971); *Meyer v. Ricklick*, 99 Ariz. 355, 357, 409 P.2d 280, 281 (1965); *Young Candy & Tobacco Co. v. Montoya*, 91 Ariz. 363, 370, 372 P.2d 703, 707 (1962); *Sheppard v. Crow-Barker-Paul No. 1 Ltd. P'ship*, 192 Ariz. 539, 549, ¶ 53, 968 P.2d 612, 622 (App. 1998). If it is clear the jury's verdict is a result of passion or prejudice, a court cannot merely offer a

remittitur on account of excessive damages, or grant a new trial limited to the question of damages, but must grant a new trial on all issues. *See Mayo v. Ephrom*, 84 Ariz. 169, 173-74, 325 P.2d 814, 817 (1958) (citations omitted).

¶**39**     In 1972, the Arizona Supreme Court examined representative Arizona case law concerning appellate review of the size of jury verdicts and the granting or refusing of a trial court's adjustment of a verdict. In *Creamer v. Troiano*, 108 Ariz. 573, 575, 503 P.2d 794, 796 (1972), Chief Justice Hays explained the test for reviewing a trial court's ruling on additur, remittitur, and new trial because of an inadequate or excessive verdict as follows:

> From what we have written, it is obvious that the test for reviewing the granting or refusing of a trial judge's adjustment of a verdict is complex and can only be solved by an ad hoc approach. Almost always when there is a conflict in the evidence, the trial judge should not interfere with what is peculiarly the jury's function, and if he does not, we will nearly always uphold him. If there is no conflict in the evidence on items that obviously were omitted from the verdict, the trial judge must adjust, and we will uphold him if he does. Behind all of these tests still stands the original doctrine - that if the verdict is supported by adequate evidence, it will not be disturbed, and the greatest possible discretion is in the hands of the trial judge. *In this court, the ultimate test will always be justice, and any case before us which shows an unjust result because of the granting or denial of either additur or remittitur, will be reversed.* Each case will be considered upon its own facts.

*Id*. at 576-77, 503 P.2d at 797-98 (emphasis added).

¶**40**     We are fully aware that, previously in that opinion, the Chief Justice pointed out that in each of the cases examined, the appellate court had affirmed the trial court, and noted, "That in itself should carry a strong inference that one of the key factors in our decisions is to give the trial judge the benefit of the doubt. Like the jury, he has had the opportunity to observe the witnesses' demeanor on the stand, and his ruling on additur, remittitur, and new trial, because of an inadequate or excessive verdict, will generally be affirmed, because it will nearly always be more soundly based than ours can be." *Id*. at 575, 503 P.2d at 796. Nevertheless, as the Chief Justice further explained:

The difficulty is that each case is slightly different, and we have to adjust to them as they come before us. Hence, in the later cases, the reasons for our opinions have not always been stated in the same words. It is also true that emotions such as passion and prejudice are rarely seen from the reporter's transcript, and must be sought - in this court - in the size of the verdict compared to damages actually proved, and tempered by how much of the damages are effectively contradicted, the prestige of the doctors who testify, undercover investigators, etc.

*Id.* at 575-76, 503 P.2d at 796-97. Accordingly, each case involving a request for remittitur must stand or fall on its own peculiar facts, and the ultimate test will always be justice. Any case which shows an unjust result because of the grant or denial of remittitur must be reversed. *See Sequoia Mfg. Co. v. Halec Constr. Co.*, 117 Ariz. 11, 25, 570 P.2d 782, 796 (App. 1977) (citing *Creamer*, 108 Ariz. at 576-77, 503 P.2d at 797-98).

¶41     We have thoroughly reviewed the entire record in the instant case. The jury was instructed it could award actual damages stemming from four different aspects of Plaintiffs' alleged injury: (1) impairment of Plaintiffs' reputation and standing in the community; (2) personal humiliation, mental anguish, and emotional distress; (3) financial damages to Plaintiffs' business, trade, profession, or occupation; and (4) financial losses actually caused by any false and defamatory statement. The evidence on damages was noticeably thin, entirely subjective, and based solely on Plaintiffs' non-specific, vague, and conclusory testimony. Accordingly, the record plainly does not objectively support the compensatory damages awarded. Plaintiffs offered no evidence of any net loss to their income related to Petta's statements. They called no independent witnesses to support their contention that their respective professional reputations had been damaged; no physician testified that he or she declined to refer surgical candidates to Plaintiffs or that members of the public otherwise declined to seek Plaintiffs' services as a result of seeing Petta's web posts or learning of any professional board complaints.[18]

---

[18]     We also note Petta's website statements were only available for viewing for a very short time, and as Petta notes in her opening brief, Plaintiffs provided no evidence of the number of visitors or "hits" to the websites on which she posted her criticisms of Plaintiffs.

¶42          Before trial, the superior court noted its concern with Plaintiffs' lack of proof of causation and specific damages when the court entered summary judgment against them on their injurious falsehood/business disparagement and wrongful interference with business relations claims,[19] and Plaintiffs' testimony at trial failed to further illuminate their assertion that Petta's statements caused them special damages. Plaintiffs' testimony about special damages was unsupported by any documentary evidence, including any business operations analysis, tax returns or similar exhibits, or expert testimony, and Plaintiffs' own conclusory statements provided little quantifiable evidence of their claimed damages, leaving the jury to speculate regarding special damages.[20] *See Gilmore v. Cohen*, 95 Ariz. 34, 36-37, 386 P.2d 81, 82-83 (1963) (recognizing in a breach of contract case that "the plaintiff in every case should supply some reasonable basis for computing the amount of damage and must do so with such precision as, from the nature of his claim and the available evidence, is possible" (citations omitted)).

¶43          Furthermore, the evidence presented does not support such an excessive award of general damages. We are aware that Plaintiffs

---

[19]     In part, the court found Plaintiffs' causation and damages evidence suffered from vagueness and "a jury would be left to speculate regarding damages."

[20]     Dr. Carlotti testified, without documentary support, that the Doctors spent "a fortune, like $100,000" in defending against Petta's claims they had altered her medical records, and incurred "a fortune" in legal fees defending against the professional board complaints. Dr. Cabret-Carlotti also testified that they lost their home to foreclosure; however, there were no exhibits admitted to support such an assertion, let alone any business analysis demonstrating any legitimate causal connection between Petta's web posts and the financial health of the Doctors' practice or personal finances. Dr. Cabret-Carlotti did testify in summary fashion that, in the twelve months after Petta initiated her website, the Doctors' "production" dropped 36 percent, and "collections" for Dr. Carlotti dropped 70.6 percent, from approximately $1.52 million in 2007 to approximately $444,000 by 2010, before he was "vindicated by the medical board." However, as counsel for Plaintiffs conceded at oral argument, Plaintiffs at trial provided no evidence of any changes in their *net* income or how any such changes were caused by Petta during the relevant time periods, which coincided with a severe economic recession.

testified as to their own emotional distress, and Dr. Carlotti testified he had lost weight and even contemplated suicide. However, the evidence also indicates that, although some of Petta's comments were actionable, much of what Plaintiffs complained of was either true or substantially true, or could be characterized as mere opinion (even if laced with spite), and did not necessarily cast Plaintiffs in a false light.[21]

¶44 Moreover, the verdict rendered in this case was approximately equivalent to the largest civil jury verdict in Arizona in 2013, and is the thirtieth largest civil verdict in Arizona in the past ten years. *See* Kelly Wilkins MacHenry, *Arizona's Civil Verdicts 2013*, Ariz. Att'ny, June 2014, at 40, 50. The next largest reported civil jury verdict for a defamation case in the last decade was $3,071,668, which ranks ninety-eighth in the top one hundred Arizona verdicts. *Id.* at 54. Thus, the verdict in this case is nearly four times the verdict entered in the next largest defamation case, and it simply cannot be reconciled with other Arizona civil jury verdicts, especially given the record before us.

¶45 Consequently, we are of the opinion that, by denying Petta's motion for new trial or remittitur, the superior court allowed Plaintiffs to obtain an award of damages not supported by adequate evidence, and allowed a verdict to stand that not only shocks the conscience of this court, but was so extreme "as to manifestly indicate passion, prejudice, mistake or a complete disregard of the evidence." *Tryon v. Naegle*, 20 Ariz. App. 138, 141, 510 P.2d 768, 771 (1973) (citations omitted). Because the ultimate test of a jury verdict is justice, and the judgment here cannot meet that test, we must vacate the judgment. *See Sequoia Mfg.*, 117 Ariz. at 25, 570 P.2d at 796 (citing *Creamer*, 108 Ariz. at 576-77, 503 P.2d at 797-98). Further, in this case the issue of liability was vigorously contested by the parties, and the issues of liability and damages are so inextricably intertwined that it is impossible to determine the degree to which the quality of the evidence submitted on one may have influenced the jury's verdict on the other; accordingly, a new trial on both liability and damages is mandated. *See Tovrea Equip. Co. v.*

---

[21] Furthermore, from our review of the entire record, it is obvious neither side was a model of propriety. The parties at times engaged in petty, unprofessional, and vengeful behavior. Petta's behavior and language toward Plaintiffs, their staff, and other patients were wholly inappropriate, and it is clear she ultimately attempted to engage Plaintiffs in what amounted to a war of attrition, but substantial evidence indicates the Doctors engaged in retaliatory behavior designed to further provoke Petta, perhaps contributing to her outbursts and contested statements, and thereby arguably provoked some of her improper behavior.

*Gobby*, 72 Ariz. 38, 42, 230 P.2d 512, 515 (1951); *Styles v. Ceranski*, 185 Ariz. 448, 451, 916 P.2d 1164, 1167 (App. 1996) ("Partial new trials are not recommended because they create much opportunity for confusion and injustice." (citations omitted)); *see also Englert v. Carondelet Health Network*, 199 Ariz. 21, 27, ¶ 15, 13 P.3d 763, 769 (App. 2000) ("Any doubt should be resolved in favor of a trial on all the issues." (citations omitted)).

### VI. *Punitive Damages*

**¶46** Petta argues the superior court erred by submitting Plaintiffs' claim for punitive damages to the jury and by refusing to grant judgment as a matter of law on punitive damages. Because we have determined that Petta is entitled to a new trial on both liability and damages, we vacate the punitive damages award in this matter; however, as the legal sufficiency of Plaintiffs' punitive damages claim may arise on remand, we briefly address Petta's arguments on appeal.

**¶47** Assuming an adequate evidentiary predicate, a jury may award punitive damages to punish a defendant for willful or malicious conduct and to deter others from similar behavior. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 n.9 (1986) (citation omitted); *accord State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) ("It should be presumed that a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." (citation omitted)); *Hudgins v. Sw. Airlines, Co.*, 221 Ariz. 472, 486, 489, ¶¶ 38, 50, 212 P.3d 810, 824, 827 (App. 2009) (recognizing that punitive damages should be awarded only in the most egregious cases and are not intended to compensate plaintiffs but to punish the wrongdoer and deter both the wrongdoer and others from future harmful conduct).

**¶48** To obtain an award of punitive damages, a plaintiff must prove by clear and convincing evidence that the defendant engaged in "reprehensible conduct combined with an evil mind over and above that required for commission of a tort." *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986). "The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them." *Id.* at 331, 723 P.2d at 680 (citing *Rawlings v. Apodaca*, 151 Ariz. 149, 160, 726 P.2d 565, 576 (1986)); *see also Volz v. Coleman Co.*, 155 Ariz. 567, 570, 748 P.2d 1191, 1194 (1987) (recognizing that

recklessness or even gross negligence is insufficient to support punitive damages).

¶49　　　We are mindful that "[a] grossly excessive punitive damage award violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution because the defendant did not have 'fair notice' of [her] exposure to the extent of punishment that could be imposed." *Hudgins*, 221 Ariz. at 489, ¶ 50, 212 P.3d at 827 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574-75 (1996); *State Farm*, 538 U.S. at 417). In determining whether a punitive damages award is so excessive as to be unconstitutional, a reviewing court examines *de novo* three guideposts: (1) the degree of reprehensibility of the defendant's misconduct, (2) the ratio between compensatory and punitive damages, and (3) how the award compares with other penalties. *Id.* at 490, ¶ 51, 212 P.3d at 828 (citing *Gore*, 517 U.S. at 575; *State Farm*, 538 U.S. at 418).

¶50　　　Petta argues Plaintiffs failed to demonstrate by clear and convincing evidence that her actions were reprehensible and guided by evil motives. *See Linthicum*, 150 Ariz. at 332, 723 P.2d at 681; *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578; *see also Medasys Acquisition Corp. v. SDMS, P.C.*, 203 Ariz. 420, 424, ¶ 18, 55 P.3d 763, 767 (2002) ("The critical inquiry should be whether such an award is appropriate to penalize a party for 'outwardly aggravated, outrageous, malicious, or fraudulent conduct' that is coupled with an 'evil mind.'" (quoting *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680)). Petta maintains her conduct did not rise to the level of "conduct involving some element of outrage similar to that usually found in crime," *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578 (quoting Restatement § 908 cmt. b), and without clear and convincing evidence of an "evil mind" that caused Plaintiffs injury, the punitive damage award should be vacated. *See Saucedo ex rel. Sinaloa v. Salvation Army*, 200 Ariz. 179, 184, ¶ 19, 24 P.3d 1274, 1279 (App. 2001) (recognizing "the conduct giving rise to punitive damages must be a proximate cause of the harm inflicted"); *see also Shaner v. Tucson Airport Auth., Inc.*, 117 Ariz. 444, 448, 573 P.2d 518, 522 (App. 1977) (stating that the evidence must establish a "reasonable probability" that a defendant's conduct caused the plaintiff's alleged harm).

¶51　　　As we have noted, the evidence in this case was hotly contested, and Plaintiffs presented substantial evidence from which the jury could have found Petta engaged in reprehensible conduct intended to injure Plaintiffs' business and professional reputations and was motivated by an "evil mind." Evidence was presented that Petta's conduct involved repeated actions (by posting her comments to several websites and making or assisting in the filing of numerous board complaints) and the jury could

have found any resulting harm was the result of intentional malice. *See Hudgins*, 221 Ariz. at 490, ¶ 52, 212 P.3d at 828 (citing *State Farm*, 538 U.S. at 419). Although substantial evidence was also presented that militated against finding Petta acted in a highly reprehensible manner, we find no error in the superior court's decision to allow the jury to consider Plaintiffs' claim for punitive damages.

## VII. *Petta's Counterclaim for Medical Battery*

¶52 Petta also argues the superior court erred in granting summary judgment on her counterclaim for medical battery. Petta acknowledges she consented to surgery on her nose in January 2008, but maintains she did not consent to the particular procedure (allegedly shortening and turning up her nose) performed by the Doctors at that time.

¶53 Plaintiffs maintain Petta lacks standing because, once she filed for bankruptcy, her claim for medical battery became property of her bankruptcy estate, subject to the sole direction and control of the Chapter 7 trustee. *See In re Bailey*, 306 B.R. 391, 392 (Bankr. D.D.C. 2004) ("In a chapter 7 bankruptcy case, any unliquidated lawsuits initiated by a debtor prepetition (or that could have been initiated by the debtor prepetition) become part of the bankruptcy estate subject to the sole direction and control of the trustee, unless exempted or abandoned or otherwise revested in the debtor."); *accord DCFS USA, LLC v. Dist. of Columbia*, 820 F. Supp. 2d 1, 3-4 (D.D.C. 2011) ("As soon as a debtor files a bankruptcy case all legal or equitable interests, including causes of action on behalf of the debtor, are transferred from the debtor to the bankruptcy estate. In a Chapter 7 case, after a trustee is appointed, only the trustee can bring actions on behalf of the estate. Thus a debtor has no standing to prosecute estate actions once a trustee has been appointed." (internal quotations and citations omitted)).

¶54 Plaintiffs are correct that a Chapter 7 debtor's claim in a lawsuit is property of the bankruptcy estate. *See* 11 U.S.C. § 541. Petta contends, however, that she "litigated the issue of ownership of her appeal rights against the bankruptcy trustee and prevailed." In support of her contention, she has provided this court with a minute entry order from the bankruptcy court indicating that, on November 28, 2012, the court denied the trustee's motion to sell Petta's "interest in state court litigation case CV2008-010464." Although at oral argument Plaintiffs disputed Petta's contention, we conclude on this record Petta has the right to assert her challenge to the superior court's grant of summary judgment regarding her claim for medical battery.

¶55        Plaintiffs next argue they were entitled to summary judgment on Petta's claim for medical battery because Petta consented to a "revision nasal tip surgery" and acknowledged before the surgery that her results were not guaranteed, and is now simply complaining about the results rather than the scope of the surgery.  We disagree with Plaintiffs' conclusion.

¶56        We review *de novo* the superior court's grant of summary judgment and its application of the law.  *Andrews v. Blake*, 205 Ariz. 236, 240, ¶ 12, 69 P.3d 7, 11 (2003); *State Comp. Fund v. Yellow Cab Co.*, 197 Ariz. 120, 122, ¶ 5, 3 P.3d 1040, 1042 (App. 1999).  In our review, we construe the facts and reasonable inferences in the light most favorable to the party opposing summary judgment.  *Wells Fargo Bank v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482, ¶ 13, 38 P.3d 12, 20 (2002*); Strojnik v. Gen. Ins. Co. of Am.*, 201 Ariz. 430, 433, ¶ 10, 36 P.3d 1200, 1203 (App. 2001).  Summary judgment is proper if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Orme Sch.*, 166 Ariz. at 309, 802 P.2d at 1008; Ariz. R. Civ. P. 56(c)(1).

¶57        "A medical malpractice action brought against a licensed health care provider  shall not be  based upon assault  and battery."  A.R.S. § 12-562(B).  Nevertheless, "claims involving lack of consent, i.e., the doctor's failure to operate within the limits of the patient's consent, may be brought as battery actions."  *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 310, ¶ 13, 70 P.3d 435, 439 (2003).  For consent to be effective, it must be "to the particular conduct, or substantially the same conduct."  *Id.* at 311, ¶ 16, 70 P.3d at 440 (citing Restatement § 892A(2)(b)).  As our supreme court further observed in *Duncan*:

> The terms and reasonable implications of the consent given determine the scope of the particular conduct covered. Restatement § 892A cmt. d.  The "scope" of consent is an issue for the trier of fact to determine.  *Id.; see also Cathemer v. Hunter*, 27 Ariz. App. [780,] 785, 558 P.2d [975,] 980 [(1976)] (holding a jury question existed as to whether a patient consented to an operation and whether the operation received was "substantially similar" to the operation to which the patient consented so as to be within the scope of the consent). "[A]nything greater or different than the procedure consented to becomes a battery."  *Hales [v. Pittman]*, 118 Ariz. [305,] 310, 576 P.2d [493,] 498 [(1978)].

*Duncan*, 205 Ariz. at 311, ¶ 16, 70 P.3d at 440.

¶**58**        "[W]hen a patient gives limited or conditional consent, a health care provider has committed a battery if the evidence shows the provider acted with willful disregard of the consent given." *Id*. at ¶ 18; *see also Meretsky v. Ellenby*, 370 So. 2d 1222, 1224 (Fla. Dist. Ct. App. 1979) (holding that, when a physician allegedly ignored the instructions of a patient and operated on the tip of the patient's nose, causing a "turned up" nose, the patient's general consent to rhinoplasty was not conclusive proof the patient had consented to the additional work, and an action for battery could be brought).

¶**59**        Plaintiffs argue and the superior court found that Petta's battery claim should fail because she consented to the surgery. However, Petta's general authorization of a surgery on her nose does not defeat her battery claim because her consent was allegedly limited. According to Petta, she explicitly conditioned her consent to removal of the scar tissue on the dorsal aspect of her nose, and expressly rejected the suggestion of any further surgical shortening or alteration of her nose. Thus, there was admissible evidence that any surgery beyond removal of the dorsal scar tissue was not consensual. *See Duncan*, 205 Ariz. at 310-11, ¶ 15, 70 P.3d at 439-40. Further, given the photographic evidence and Dr. Caniglia's report, a reasonable jury could find Petta's nose had been shortened and "turned up" by the surgery, and the limited information provided on the signed consent and release forms leaves open to interpretation whether the surgery exceeded the scope of Petta's authorized consent. The parties characterize differently the surgery to which Petta consented, and the relevant inquiry is not whether Petta consented to surgery; rather, whether she consented to the particular procedure Plaintiffs performed. *See id*. at ¶ 18. On this record, the superior court erred in granting Plaintiffs' motion for summary judgment as to Petta's counterclaim for medical battery. Accordingly, we remand that claim for trial as well.[22]

---

[22]        Plaintiffs do not argue, and we do not address, Plaintiffs' argument made in support of their motion for summary judgment that Petta's counterclaim fails because Petta cannot identify which of the Doctors performed the surgery.

## CONCLUSION

**¶60**        We affirm the superior court's denial of Petta's motions for judgment as a matter of law.  We vacate the judgment in favor of Plaintiffs and remand for a new trial, however, because the jury verdict cannot be supported by the damages evidence presented and shocks the conscience of this court.  We also reverse the superior court's summary judgment on Petta's counterclaim for medical battery.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama