164 P.3d 691

**NEONATOLOGY ASSOCIATES, LTD., Plaintiff/Appellant,**

v.

**PHOENIX PERINATAL ASSOCIATES INC.; Neonatal Specialists, Ltd.; Obstetrix Medical Group of Phoenix, P.C.; Pediatrix Medical Group, Inc., Defendants/Appellees.**

No. 1 CA–CV 06–0457.

Court of Appeals of Arizona, Division 1, Department D.

Aug. 21, 2007.

Lewis and Roca LLP By Diane M. Lindquist, Tucson, Attorneys for Plaintiff/Appellant.

Mariscal, Weeks, McIntyre & Friedlander By D. Samuel Coffman, Phoenix, and Sidley Austin LLP By Richard D. Raskin and Scott D. Stein, Chicago, IL, Co–Counsel for Defendants/Appellees.

## OPINION

EHRLICH, Judge.

¶ 1 Neonatology Associates, Ltd. ("NAL") appeals the summary judgment against it and in favor of Phoenix Perinatal Associates, Inc. ("PPA"), Neonatal Specialists, Ltd. ("NSL"), Obstetrix Medical Group of Phoenix, P.C., and Pediatrix Medical Group, Inc.

(collectively "Obstetrix"). For the following reasons, we affirm.

## FACTUAL[1] AND PROCEDURAL BACKGROUND

¶ 2 This is a dispute between two groups of physicians: NAL, a group of neonatologists, and Obstetrix, a group of neonatologists and perinatologists. NAL contracts with various healthcare insurance plans to provide neonatal services to the plans' members as an "in-network" provider. Its contracts with seven of those plans (the "relevant plans") are at issue. For several of the relevant plans, NAL is or has been at material times the sole in-network neonatal care provider.

¶ 3 Obstetrix perinatologists were formerly employed by PPA, which was also an in-network provider for at least some of the relevant plans. Obstetrix neonatologists formerly practiced as NSL, which had not contracted with any of the relevant plans. NSL physicians were, therefore, considered "out-of-network" providers for the relevant plans. PPA and NSL merged in June 2002 to form Obstetrix Medical Group of Phoenix, which is administered and managed by Pediatrix Medical Group, Inc. Since the merger, Obstetrix perinatologists are considered in-network providers of perinatal care for some of the relevant plans, but Obstetrix neonatologists remain out-of-network providers for neo-natal care.

¶ 4 Before Obstetrix Medical Group was formed, PPA physicians typically referred their patient-members of the relevant plans whose babies needed neonatal care to NAL physicians. Since forming Obstetrix Medical Group, however, they have referred their patients to Obstetrix neonatologists, who have treated the patients without compensation if the patients' plans refused to pay for Obstetrix neonatal services.[2]

¶ 5 NAL sued Obstetrix, alleging that Obstetrix's practice of referring patients out-of-network to its own neonatologists rather than to NAL physicians constitutes interference with NAL's contractual relationship with the relevant plans and unfair competition. Obstetrix filed a motion for summary judgment that the trial court granted, and NAL timely appealed.

## DISCUSSION

¶ 6 We review the trial court's summary judgment *de novo*. *Wells Fargo*, 201 Ariz. at 482 ¶ 13, 38 P.3d at 20. We will affirm that judgment if there is no genuine issue of material fact and if Obstetrix is entitled to judgment as a matter of law. *Id.* at ¶ 14.

¶ 7 To prove the tort of intentional interference with contractual relations, a plaintiff must show:

> the existence of a valid contractual relationship or business expectancy; the interferer's knowledge of the relationship or expectancy; intentional interference inducing or causing a breach or termination of the relationship or expectancy; and resultant damage to the party whose relationship or expectancy has been disrupted. . . . In addition, the interference must be improper as to motive or means before liability will attach.

*Wallace v. Casa Grande Union High Sch. Dist. No. 82 Bd. of Governors*, 184 Ariz. 419, 427, 909 P.2d 486, 494 (App.1995) (citations omitted). NAL contends that disputed issues of fact exist as to whether Obstetrix's conduct constitutes interference and whether that conduct is improper. Because we disagree that there is any genuine issue of material fact as to the propriety of Obstetrix's conduct, we need only address that issue.

¶ 8 To be actionable, interference must "be *both* intentional and improper. . . . If the interferer is to be held liable for committing a wrong, his liability must be based on more than the act of interference alone. Thus, there is ordinarily no liability absent a showing that defendant's actions

---

1. We view the facts and all reasonable inferences drawn therefrom in the light most favorable to NAL. *Wells Fargo Bank v. Ariz. Laborers Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 482 ¶ 13, 38 P.3d 12, 20 (2002).

2. Although Obstetrix has sought payment for neonatal care from the relevant plans, payment has generally been refused, and Obstetrix has not requested payment directly from its patients.

were improper as to motive or means." *Safeway Ins. Co. v. Guerrero*, 210 Ariz. 5, 11 ¶ 20, 106 P.3d 1020, 1026 (2005) (citation omitted); *see Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 388, 710 P.2d 1025, 1043 (1985) (superseded by statute not relevant to this case). The Arizona Supreme Court has adopted the factors expressed in Section 767 of The Restatement (Second) of Torts (1979) for determining whether conduct is improper for purposes of a tortious interference claim.

Whether a particular action is improper is determined by a consideration of seven factors:

(a) the nature of the actor's conduct,

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Wagenseller*, 147 Ariz. at 387, 710 P.2d at 1042. Thus, although "the 'intentional' element of tortious interference focuses on the mental state of the actor, ... the 'improper' element in contrast 'generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded.'" *Safeway*, 210 Ariz. at 11 ¶ 21, 106 P.3d at 1026 (quoting *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 35, 730 P.2d 204, 212 (1986)).

■ ¶ 9 Generally, the issue of motive or the propriety of an action is one of fact and not law, but we may resolve the issue as a matter of law when there is no reasonable inference to the contrary in the record. *Woerth v. City of Flagstaff*, 167 Ariz. 412, 419, 808 P.2d 297, 304 (App.1990). The standard for liability, however, "must be applied with discrimination, particularly where the conduct in question takes place in the context of competitive business activities." *Bar J Bar Cattle Co. v. Pace*, 158 Ariz. 481, 483, 763 P.2d 545, 547 (App.1988).

¶ 10 NAL recognizes that Obstetrix neonatalogists are qualified and competent, and, although NAL disputes Obstetrix's contention that Obstetrix's "model of care" is advantageous to patients, there is no dispute that Obstetrix patients receive quality care from Obstetrix neonatologists. Therefore, the conduct at issue is Obstetrix perinatologists' practice of routinely referring their patients to qualified neonatologists within their own practice group, accepting the risk that the relevant plans will not reimburse Obstetrix for its services. NAL posits three theories under which this conduct could be considered improper; we agree with none of its contentions.

■ ¶ 11 NAL first argues that improper conduct may be found based on Obstetrix's deviation from the standard industry practice of referring patients in-network. *See Wells Fargo*, 201 Ariz. at 494–95 ¶¶ 82–85, 38 P.3d at 32–33 (considering bank's deviation from "prudent and reasonable banking practices" in determining question of fact presented on propriety of bank's forbearance agreements and loan extension). As NAL acknowledges, however, this standard practice has arisen because the healthcare industry "is dominated by health insurance plans that compensate only physicians, physician groups, and medical facilities that the plan has approved or contracted with." Obstetrix is essentially treating patients outside that insurance-dominated market by not charging its patients for non-covered neonatal services, but nothing in the record suggests that the standard practice alleged by NAL applies or should apply in this situation.

■ ¶ 12 A patient's membership in a particular health-insurance plan entitles the patient to seek payment for services rendered in accordance with that plan. It does not create a corresponding right for physicians contracted with that plan to treat the patient, nor does it require the patient to use his or her insurance. A finding of impropriety based on Obstetrix's deviation from standard insurance referral practices given the undisputed circumstances in this case would not be reasonable. *See Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990) (Summary judgment is appropriate "if the facts produced in support of the claim or

defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent.").

¶ 13 NAL also argues that impropriety may be found based on Obstetrix's alleged breach of its own contractual relationship with the relevant plans. NAL contends that "[e]ach contracted provider typically agrees to refer patients exclusively to other in-network physicians, with limited exceptions, such as pre-authorized out-of-network care or emergency." NAL has conceded, however, that Obstetrix has had no contractual relationship with two of the relevant plans since its formation. Moreover, we are unable to conclude on this record that any contract that Obstetrix has or has had with the relevant plans for perinatal services prohibits Obstetrix physicians from referring patients routinely to out-of-network physicians for non-covered treatment.[3]

¶ 14 NAL argues that a question of fact exists as to Obstetrix's motive for referring patients to its own neonatologists. Obstetrix contends that its referral policy is based on its physicians' opinion that its model of care is advantageous to the patients. NAL responds that the record "supports the inference that Obstetrix's self-referral practice is business-driven and does not involve the exercise of medical judgment."

¶ 15 A question of fact as to a specific motive is only material if one of the possible motives supported by the record may be considered improper, and NAL implicitly concedes that referrals motivated by legitimate medical judgment are proper. A business-driven motive, in and of itself, is not an improper motive. Indeed, Arizona courts have held that a business "competitor does not act improperly if [its] purpose at least in part is to advance [its] own economic interests." *Miller v. Hehlen*, 209 Ariz. 462, 471 ¶ 32, 104 P.3d 193, 202 (App.2005) (quoting *Bar J Bar*, 158 Ariz. at 485, 763 P.2d at 549); *see also* The Restatement (Second) of Torts § 768 (1979). NAL has neither presented evidence of anything more nefarious than business competition nor evidence from which a reasonable jury could find that Obstetrix acted improperly. Therefore, summary judgment on NAL's claim for tortious interference with contract was appropriate.

¶ 16 NAL argues that "Obstetrix's conduct constitutes unfair competition for the same reasons it is 'improper.'" Because there is no genuine issue of material fact as to the propriety of Obstetrix's referral practices, summary judgment in favor of Obstetrix on NAL's claim for unfair competition was likewise warranted.

## CONCLUSION

¶ 17 For the foregoing reasons, the judgment is affirmed.

CONCURRING: LAWRENCE F. WINTHROP, Presiding Judge and SHELDON H. WEISBERG, Judge.

---

3. Although some of PPA's and/or Obstetrix's contracts are in the record, NAL does not cite those contracts as support for its contention on this point. Rather, it cites its statement of facts in opposition to the Motion for Summary Judgment, specifically paragraphs 39–51, which are facts appearing under the heading "How Patients Come to Neonatologists: The Role of Insurance." Most of the facts in these paragraphs refer to the general practice in the industry and PPA's practice of referrals to NAL before the formation of Obstetrix. Only paragraph 49 addresses typical contractual provisions for referring physicians: "It is also standard for participating, in-network physicians to sign contracts with the health plans agreeing to refer only to in-network physicians, unless the patient receives prior authorization for an out-of-network referral." As support for that statement of fact, however, NAL cites only Obstetrix's statement of undisputed fact paragraph 38, and that paragraph is merely a chart of the plans with which NAL and Obstetrix perinatologists were contracted during the relevant time. It includes no information about the terms of Obstetrix's contracts.

NAL also refers generally to Obstetrix's statement of undisputed facts. It does not cite a specific fact within the 95 facts contained in that statement that supports its characterization of Obstetrix's contractual obligations, however.

Finally, NAL cites letters from various health plans reminding Obstetrix of NAL's relationship with the plan and requesting that patients be transferred to an NAL physician. In none of these letters, though, do the plans assert that Obstetrix is treating these patients in breach of its own contracts with the plans.