NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

———————————————

AZIZ HELAL and TERESA HELAL, husband and wife,
*Plaintiffs/Appellees*,

*v.*

BRIAN WINSKI and AMY WINSKI, husband and wife;
AMERICAPITAL MORTGAGE & INVESTMENTS, LLC, an Arizona
limited liability company; STAR 1 INVESTMENTS, LLC, an Arizona
limited liability company, *Defendants/Appellants*.

No. 1 CA-CV 14-0201
FILED 12-15-2015

———————————————

Appeal from the Superior Court in Maricopa County
No. CV2011-052561
The Honorable Michael D. Gordon, Judge

**AFFIRMED**

———————————————

COUNSEL

Aziz Helal, Teresa Helal, Mesa
*Plaintiffs/Appellees*

Udall Shumway PLC, Mesa
By Joel E. Sannes
*Counsel for Defendants/Appellants*

---

**MEMORANDUM DECISION**

Presiding Judge Randall M. Howe delivered the decision of the Court, in which Judge Jon W. Thompson and Judge Lawrence F. Winthrop joined.

---

**H O W E**, Judge:

**¶1**　　　　Brian and Amy Winski, Americapital Mortgage and Investments, LLC, and Star 1 Investments, LLC, (collectively, the "Winskis")[1] appeal the trial court's judgment against them and its award of $233,000 in compensatory damages and punitive damages to Aziz and Teresa Helal. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**　　　　In March 2011, the Helals sued the Winskis and entities they were associated with, suspecting that the Winskis had set up "all kinds of fraudulent moves" to defraud them of their two condominiums. The Helals alleged that Mr. Winski intentionally misrepresented to them that he would look for investors for them to refinance the properties' loans with M&I Bank. They alleged that by doing so, Mr. Winski obtained personal and private information and documents from them to further his and his wife's financial interest, including purchasing the properties' promissory notes and deeds of trust from M&I without notifying the Helals. They further alleged that Mr. Winski's action in turn prevented the Helals from refinancing their loans and retaining their properties. Although the parties presented conflicting evidence at trial, the trial court found that the Winskis defrauded the Helals by intentionally leading them on while working separately with M&I to buy the Helals' properties' promissory notes and deeds of trust. The sequence of events between the Helals and Winskis explain the trial court's decision to rule in favor of the Helals.

---

[1]　　　　WEE II Family Revocable Trust of January 21, 1999, which is not a party in this case, is the Winskis' family trust and of which they are the beneficiaries. WEE II owns Star 1, of which the Winskis are trustees. Mrs. Winski owned Americapital, which used Star 1 as its purchasing agent, and the Winskis are Americapital's employees.

## 1. The Refinancing Process

¶3        In December 2009, the Helals applied to M&I for loan modifications on two of their eight condominiums because they had defaulted on the loans, which totaled $488,000. M&I rejected their applications and recorded notices of trustee sale for the properties in April 2010. The bank later canceled the sale, however, and a representative contacted the Helals in October to discuss settling the loans for $98,094, due in two installments, one on November 29, 2010, and the other on December 22, 2010. The Helals agreed and signed an agreement.

¶4        The Helals then contacted Simone Lohse, a friend and partner at Mesquite Investment Partners ("MIP"), to finance their payoff to M&I. Mrs. Lohse responded that she would check with her partners to see whether MIP could finance the Helals. On December 10, she had the Helals fill out a "Uniform Residential Loan Application." MIP could not finance the Helals, but Mrs. Lohse said that she would "do [her] research to do [them] a personal favor."

¶5        On December 11, Mrs. Lohse told the Helals that a few people had investors that were interested in financing them, but that the potential investors wanted more information about the loans and properties. The Helals emailed Mrs. Lohse the requested information. By the end of the day, she told them that Mr. Winski, a mortgage broker with Americapital, was interested in being their broker. But Mr. Winski wanted their loan application and M&I settlement agreement and to show his potential investor the properties.

¶6        Two days later, Mr. Helal emailed Mrs. Lohse pictures of the properties, and she forwarded the information, including his loan application, to Mr. Winski, noting that "the app need[ed] a little fine tuning." On December 15, Mr. Helal emailed Mrs. Lohse and Mr. Winski the M&I settlement agreement and the two properties' tenant leases. Two days later, Mr. Helal showed Mr. Winski and his investor the properties. After the tour, Mr. Winski asked for the properties' leases again and the name of Mr. Helal's contact person at M&I. On December 20, Mr. Helal emailed to Mr. Winski his M&I representative's contact information and the M&I settlement agreement.

¶7        The next day, Mr. Winski contacted Mr. Helal with a loan refinancing option, offering a one-year $120,000 loan with a $50,000 payment in interest. The agreement also required the Helals to make improvements on the properties with the difference between what they

owed and the amount to be loaned to them. Mr. Helal immediately rejected the offer.

¶8        Mr. Helal then called Mrs. Lohse and told her about the offer, but not its terms. She in turn called Mr. Winski, who told her the terms. She responded that of her many years working with private loans, she had never seen such an unreasonable offer; he replied that "many different investors" were involved in the group and he might be able to find the Helals a better offer. Mr. Winski also said that he would do more research and get back to her. Mrs. Lohse asked why the offer was not in writing; Mr. Winski explained that "the particular investor" wanted it that way.

¶9        Mrs. Lohse then called other people to find an investor because the Helals' deadline to M&I was fast approaching. Meanwhile, as a precaution, the Helals and Mrs. Lohse contacted the Helals' M&I representative, asking for an extension on their December 22 payment deadline because their first offer fell through. The representative orally agreed to an extension.

¶10       After the winter holidays, Mrs. Lohse referred the Helals to a new mortgage broker from Mortgage Quest. But on January 3, Mr. Winski called Mrs. Lohse and explained that he had a different investor on hand. He stated that he needed the properties' remaining six lease agreements to have a "full package," however. Mrs. Lohse emailed Mr. Winski the information that same day. She explained to Mr. Winski, however, that because the Helals had not heard from him since December 21, they were working with another mortgage broker.

¶11       Still without a loan, the Helals asked for another extension. But this time the bank denied the extension and offered a second settlement agreement, which provided a settlement amount of $100,000 due on January 7, 2011. The Helals signed the agreement, but later asked for a payoff extension. The bank representative again orally agreed.

¶12       Mortgage Quest's mortgage broker contacted the Helals' M&I representative on January 5 and maintained contact with him to keep him informed about the Helals' loan application process. On January 5, the mortgage broker emailed potential lenders the Helals' "scenario," including their initial application, the properties' lease agreements, and the M&I agreement. Americapital was coincidentally one of the recipients, and Mrs. Winski responded that she was "working on it." Several days later, the mortgage broker found the Helals a lender, American Life Financial, and put them in contact with the lender's representative.

¶13            On January 7, American Life sent the Helals a pre-approval letter for a five-year loan for $115,000 at 9.990%; the Helals' mortgage broker forward the letter to the M&I representative. The Helals signed the letter on January 10. Because American Life needed a property appraisal and inspection for all their loans, the Helals arranged for the services. Their mortgage broker emailed the M&I representative two days later informing him of the appraisal and inspection and also requesting confirmation of January 21 as the closing date, per a previous conversation between the M&I representative and the lender's representative.

¶14            Unbeknownst to the Helals, Mrs. Lohse, and the Helals' mortgage broker and lender's representative, M&I had sold the Helals' properties' promissory notes and deeds of trust to Star 1 on January 12. The notes' "sale and assignment agreement" and "assignment of beneficial interest under deed of trust" showed that Mr. Winski signed for Star 1. Two days later, Star 1 "by B&AW Family LLC" and "WEE II Family Revocable Trust of January 21, 1999," had assigned the notes, secured by the deeds of trust, to Cadillac Properties. Mrs. Winski signed the assignments as "Amy Lynne Winski, Co-Trustee of the WEE II Family Revocable Trust of January 21, 1999, sole Member of B&AW Family, LLC, an Arizona limited liability company, as sole Member of Star 1 Investments, LLC, an Arizona limited liability company." The assignment was recorded on January 19.

¶15            Also on January 19, the Helals, thinking that they had finally secured the money needed to save their properties, signed their refinancing loan's closing settlement agreement. That same day, their mortgage broker informed the M&I representative, and the lender's representative emailed the M&I representative the Helals' preliminary commitment of title insurance and told him that they were ready to close on January 21. But the next day, the M&I representative emailed the mortgage broker and lender's representative that M&I had sold the promissory notes and they should direct questions to Accurate Foreclosure & Documents Services, a company owned and managed by Mrs. Winski.

¶16            On January 26, Accurate informed Mr. Helal that the new notes holder, Cadillac, hired it to start the foreclosure process and collect on the entire two original loans. Accurate then recorded notices of trustee's sale on the properties on January 28. It then sent the Helals foreclosure payment statements, totaling $571,460.59. M&I then informed the Helals that both their loans had been settled for $50,000 each and that they had no further obligations to the bank. After the foreclosure sale where Cadillac bought the notes for $250,000, Cadillac filed a deficiency judgment against

the Helals for $233,600. That court awarded that amount to Cadillac along with $8,910 in attorneys' fees.

¶17        Mr. Helal reckoned that something was amiss, "got curious," and started investigating. He discovered that M&I had sold their notes and assigned their deeds of trust to Star 1 on January 12, which assigned them to Cadillac two days later. For the sale, Mr. Winski signed for Star 1, and for the assignments, Mrs. Winski signed for Star 1. The Winskis recorded all the assignments on January 19—the same day that the Helals were signing their loan closing documents and a day before M&I told them that their notes had been sold. Mr. Helal also found that Star 1, Accurate, and Americapital were registered with the Secretary of State using the same address and all owned by Mrs. Winski. Suspecting that the Winskis had defrauded them, the Helals sued, as relevant here, the Winskis, Americapital, and Star 1 for, among other things, breach of fiduciary duty and tortious interference with contractual relations and of business expectancy.

## 2. The Trial and Resulting Judgment

¶18        At the subsequent trial, the Helals—unable to afford counsel—represented themselves and presented evidence, including testimony from Mrs. Lohse and their mortgage broker and lender's representative, explaining how the Winskis took advantage of their predicament to obtain their properties. The Winskis, however, told a different story. Specifically, Mr. Winski testified that he was not the Helals' mortgage broker because Mrs. Lohse was their broker. Mr. Winski explained that Mrs. Lohse merely gave him the Helals' scenario and asked whether he wanted to become involved. But Mr. Winski explained later that "from day one, [he] was under the belief that [they] were buying a discounted distressed note." Mr. Winski also testified that he did not offer the Helals a loan, but instead offered to buy their notes. He admitted that he contacted M&I and insisted that during his conversation with M&I, the bank representative asked him to buy the Helals' notes. Mr. Winski explained that this was the only viable option because, after checking the properties' titles, he found judgment liens against the Helals, which followed the properties, and "[it] would've been impossible to fund a new loan without paying off judgments against the Helals."

¶19        Mr. Winski also testified that "M&I was begging [them] to buy the note[s]"and "wanted out" and that around Christmas, M&I told him that "[t]hat deal [wasn't] happening." Mr. Winski stated that the M&I representative contacted him on January 10, saying that the Helals had

defaulted on their January 5 settlement agreement and that the bank ceased discussions with the Helals on January 5, and asking whether Americapital was interested in buying the notes. Star 1 purchased the notes, thereby taking M&I's first priority position over the loans. Mr. Winski explained that by doing so, Star 1 would not have to pay the Helals' judgment creditors.

**¶20**     Mr. Winski further testified that they would have found out about the Helals' distressed notes regardless whether Mrs. Lohse had contacted him. He explained that "[a]bout every two weeks, [M&I] w[as] sending out a list of loans that were in default that [it] would solicit offers on." For the Helals' notes, however, Mr. Winski could not "remember whether [they were] or [weren't], and whether [they] would have been or not been" on the lists. His "guess" was that they were "probably" on the December 5 list, but he could not recall seeing the notes on any lists.

**¶21**     After considering the evidence, the trial court rejected the Winskis' defense that the Helals' sought-after financing was impossible because of the existence of several unsecured judgment creditors. The court noted that although the Winskis presented some evidence of such creditors' existence, no credible evidence showed that those judgments were recorded in the county recorder's office—a necessary predicate to obtaining a lien on real property. The court also rejected the Winskis' other defenses, including that the Helals had lied on their initial loan application and that they adequately explained to the Helals their proposed transaction, because the defenses "strained credulity" and were "difficult to believe."

**¶22**     The trial court found that the Helals proved that the Winskis had breached their fiduciary duties because the Helals and Mr. Winski had entered into a broker-borrower relationship, that Mr. Winski acted for and on behalf of the martial community, and that his actions were "egregious, outrageous, and conducted with an evil mind." The court also found that Mr. Winski committed the torts of interference with a contractual relationship and of business expectancy on behalf of and for the martial community's benefit and that his action was egregious, outrageous, and conducted with an evil mind. The court awarded the Helals $233,000 in compensatory damages, $150,000 in punitive damages, $5,000 in attorneys' fees, and $413.75 in taxable costs. The Winskis timely appealed.

## DISCUSSION

**¶23**     The Winskis argue that the trial court erred in finding that (1) a fiduciary relationship existed between the Helals and Mr. Winski and

(2) Mr. Winski tortiously interfered with the contractual relations and business expectancy between the Helals and M&I. They also argue that the court erred in awarding the Helals (3) $233,000 in compensatory damages and (4) punitive damages and that (5) the court's questioning during trial resulted in "plain error." On appeal, we view the evidence in the light most favorable to sustaining the verdict. *Desert Palms Surgical Group, P.L.C. v. Petta*, 236 Ariz. 568, 578 ¶ 25, 343 P.3d 438, 448 (App. 2015). When the evidence conflicts, we resolve the conflict and draw every reasonable inference in favor of the prevailing party. *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987). If any substantial evidence exists to reach the result, we will affirm the judgment. *Desert Palms*, 236 Ariz. at 578 ¶ 25, 343 P.3d at 448. Here, the trial court did not err because the record supports all its findings and awards and its impartiality during trial.

## 1. The Fiduciary Relationship

**¶24** The Winskis first argue that the trial court erred in finding that a fiduciary relationship existed between the Helals and Mr. Winski.[2] We review de novo the existence of a fiduciary duty. *TM2008 Invs., Inc. v. Procon Capital Corp.*, 234 Ariz. 421, 424 ¶ 12, 323 P.3d 704, 707 (App. 2014). Because a fiduciary relationship existed between the Helals and Mr. Winski, the trial court did not err.

**¶25** "A fiduciary relationship exists between a broker and his client, and the broker owes his client the utmost good faith" as a result of that relationship. *Underdown v. Reche*, 122 Ariz. 439, 441, 595 P.2d 671, 674 (App. 1979). A fiduciary relationship is something resembling business agency, professional relationship, or family tie, impelling or inducing the trusting party to relax the care and vigilance he would normally exercise. *Taeger v. Catholic Family & Cmty. Servs.*, 196 Ariz. 285, 290 ¶ 11, 995 P.2d 721,

---

[2] The Winskis included "breach of fiduciary duty" in their briefs' headings, but because they presented no arguments that Mr. Winski did not breach his fiduciary duty on appeal, they have waived the issue. *See* Ariz. R. Civ. App. P. 13(a)(6) (providing that the opening brief "must set forth" an argument, which "must contain . . . contentions concerning each issue presented for review, with supporting reasons for each contention, and with citations of legal authorities and appropriate references to the portions of the record on which the appellant relies"); *State v. Felkins,* 156 Ariz. 37, 38 n.1, 749 P.2d 946, 947 n.l (App. 1988) (claim abandoned when not supported by sufficient authority).

726 (App. 1999). Mere trust in another's competence or integrity does not suffice to create such a relationship; instead, peculiar reliance in another's trustworthiness is required. *Standard Chartered PLC v. Price Waterhouse*, 190 Ariz. 6, 24, 945 P.2d 317, 335 (App. 1996). The parties' relationship must be such that one is bound to act for the other's benefit and may be characterized by great intimacy, disclosure of secrets, or entrusting of power. *Cook*, 227 Ariz. at 334 ¶ 14, 258 P.3d at 152. In such a relationship, the fiduciary holds "superiority of position" over the beneficiary, and this position may be demonstrated "in material aspects of the transaction at issue by a substitution of the fiduciary's will." *Standard Chartered*, 190 Ariz. at 24, 945 P.2d at 335 (internal quotation marks and citation omitted). An alleged beneficiary's reliance on the alleged fiduciary's superior knowledge creates a fiduciary relationship when "the knowledge is of a kind beyond the fair and reasonable reach of the alleged beneficiary and inaccessible to the alleged beneficiary through the exercise of reasonable diligence." *Id.* at 25, 945 P.2d at 336.

**¶26**　　　Here, Mr. Winski was the Helals' broker and a fiduciary relationship existed between the Helals and him. The record shows that the Helals trusted Mr. Winski and believed that he would act for their benefit. Their interactions reasonably lead the Helals to place a great degree of trust in Mr. Winski and his company. The Helals sent Mr. Winski their initial loan application, consisting of private information regarding their finances and their properties, along with their settlement agreement with M&I. After he told them that he was interested in being their broker and requested additional information, including pictures of their properties, leases with their tenants, and their M&I representative's contact information, they obliged. When Mr. Winski wanted to show his "investor" the properties, they obliged within a few days and gave the individuals a tour.

**¶27**　　　The record also demonstrates that Mr. Winski had superior knowledge about potential investors and that the knowledge was beyond the fair and reasonable reach of the Helals. When the Helals were working with Mr. Winski, he was their sole source of information for potential investors. Neither the Helals nor Mrs. Lohse had access to Mr. Winski's network of potential investors, even with exercise of reasonable diligence. Indeed, the Helals and Mrs. Lohse were seeking a broker for the Helals because they lacked the knowledge and access to potential investors that Mr. Winski and others working as mortgage brokers had.

**¶28**　　　The Winskis counter that Mr. Winski was not the Helals' broker because Mrs. Lohse was their broker. But Mrs. Lohse made clear during trial that her role was merely to find a broker for the Helals. She

testified that she told Mr. Winski during their first conversation that she did not represent the Helals, because she was not a mortgage broker, and that she was looking for a broker for the Helals as a personal favor. Further, Mrs. Lohse's involvement in the transaction shows her minimal role: she merely connected the individuals and forwarded requested documents. She did not attend the properties' touring, and she was not the individual Mr. Winski contacted to make the refinancing offer. She learned of the offer when Mr. Helal contacted her after he immediately rejected it.

¶29 The Winskis also counter that they were acting for their investor clients, not the Helals. But Mr. Winski voluntarily entered his position as the Helals' mortgage broker by accepting the responsibility of finding potential investors for them and repeatedly asking them for information regarding their properties. The record shows that during the period the Helals were working with Mr. Winski, he was the sole source of information about potential investors and led them to believe that he had found them a potential investor, especially when he made an offer for a one-year $120,000 loan with a $50,000 payment in interest. He further confirmed his position as broker when, after Mr. Helal rejected the refinancing offer, Mr. Winski told Mrs. Lohse that he would try to find another investor. Moreover, only after Mr. Helal rejected Mr. Winski's offer did Mr. Helal work with another broker.

¶30 The Winskis further counter that no fiduciary relationship existed because the parties never agreed to such a relationship and "[g]enerally, commercial transactions do not create a fiduciary relationship unless one party agrees to serve in a fiduciary capacity." *Cook*, 227 Ariz. at 334 ¶ 14, 258 P.3d at 152. But a fiduciary relationship is not formed merely by an express agreement as the Winskis propose: "The law . . . *requires peculiar intimacy or* an express agreement [for one party] to serve as a fiduciary." *Id.* at ¶ 15 (emphasis added). The record here shows the intimacy and entrusting of power necessary for the existence of a fiduciary relationship. The Helals sent Mr. Winski personal and private information; they worked exclusively with him for a period of time; and he had specialized knowledge that was beyond their fair and reasonable reach. Consequently, the record supports the trial court's finding that Mr. Winski was the Helals' broker and a fiduciary relationship existed between the Helals and Mr. Winski.

### 2. Tortious Interference with Contractual Relations and Business Expectancy

¶31 The Winskis next argue that the trial court erred in finding that Mr. Winski tortiously interfered with the Helals' contractual relations and business expectancy. The elements for tortious interference with contractual relations or business expectancy are (1) the existence of a valid contractual relationship or business expectancy; (2) the interferer's knowledge of the relationship or expectancy; (3) the interferer's intentional interference inducing or causing a breach or termination of the expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Neonatology Assocs., Ltd. v. Phoenix Perinatal Assocs. Inc.*, 216 Ariz. 185, 187 ¶ 7, 164 P.3d 691, 693 (App. 2007). Further, "the interference must be improper as to motive or means before liability will attach." *Id.* Although tortious interference with a business expectancy covers situations that intentional interference with a contract does not, the former is only available in situations where the plaintiff can identify the specific relationship with which the defendant interfered. *Dube v. Likins*, 216 Ariz. 406, 414 ¶ 19, 167 P.3d 93, 101 (App. 2007).

¶32 Here, Mr. Winski tortiously interfered with the Helals' contractual relations and business expectancy with M&I. First, the record shows that a valid contractual relationship and business expectancy existed between the Helals and M&I. Because the Helals defaulted on their loans, M&I offered them settlement agreements, which the Helals signed and accepted. In exchange for giving M&I the payoff amount, the Helals expected to keep their properties. Second, Mr. Winski knew of the relationship between the Helals and M&I because the Helals provided him with their initial loan application and settlement agreement. Mr. Helal further met Mr. Winski and his investor for a tour of the properties and forwarded additional information to him. Although the Winskis claim that Mr. Winski knew only of the first settlement agreement, which expired on December 22, on January 3, Mr. Winski contacted Mrs. Lohse for more information regarding the properties because he had another potential investor for the Helals—this action indicated that he knew more than the Winskis claim.

¶33 Third, Mr. Winski's intentional interference led M&I to breach its settlement agreement with the Helals. Because Star 1 bought the notes from M&I, the Helals were unable to complete the negotiated payoff with the bank. Finally, as a result of Star 1's purchase of the notes, the Helals lost properties they were working to save. Cadillac then had Accurate—a trustee entity operated by Mrs. Winski—foreclose on the properties and

brought a deficiency action against the Helals. Consequently, Mr. Winski's actions were improper as to motive and means. He knew the Helals' situation and took full advantage of it to benefit himself and his company. Because the record supports the trial court's finding the Mr. Winski tortiously interfered with the Helals' contractual relations and business expectancies with M&I, the trial court did not err.

### 3. Compensatory Damages

**¶34**        The Winskis next argue that the trial court erred in awarding the Helals $233,000 in compensatory damages because the court provided no explanation for the damage amount. We review an award of damages for an abuse of discretion. *Gonzalez v. Ariz. Pub. Serv. Co.*, 161 Ariz. 84, 90, 775 P.2d 1148, 1154 (App. 1989). "If the verdict is supported by adequate evidence, it will not be disturbed, and the greatest possible discretion is in the hands of the trial judge." *Roberts v. City of Phoenix*, 225 Ariz. 112, 123 ¶ 41, 235 P.3d 265, 276 (App. 2010). Here, the evidence supported the trial court's award. The record shows that because Star 1 bought the Helals' notes, preventing the Helals from paying M&I their negotiated payoff, their properties were ultimately foreclosed upon. Then, a deficiency judgment was bought against them by Accurate, a trustee entity operated by Mrs. Winski. The deficiency judgment was for $233,600—$600 more than the amount the trial court awarded in this case. Consequently, because the record supports the trial court's award, the court did not err.

### 4. Punitive Damages

**¶35**        The Winskis next contend that the trial court erred in awarding the Helals punitive damages because Mr. Winski did not intend to injure, defraud, or consciously disregard the probability of some injury to the Helals.[3] Whether punitive damages are properly awarded is a legal question we review de novo. *See Medasys Acquisition Corp. v. SDMS, P.C.*, 203 Ariz. 420, 422 ¶ 8, 55 P.3d 763, 765 (2002); *Hall v. Lalli*, 194 Ariz. 54, 57 ¶ 5, 977 P.2d 776, 779 (1999). For a punitive damages award, "a plaintiff must prove by clear and convincing evidence that the defendant engaged in reprehensible conduct combined with an evil mind over and above that required for commission of a tort." *Petta*, 236 Ariz. at 584 ¶ 48, 343 P.3d at 454. A defendant acts with the requisite evil mind when he intends to injure

---

[3]        Because the Winskis do not challenge the amount of the punitive damages award, we need not examine its reasonableness. *See State Farm Mut. Auto. Inc. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

or defraud, is motivated by spite or ill will, or deliberately interferes with the rights of others, "consciously disregarding a substantial risk that his conduct might significantly harm others." *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 498 ¶ 81, 200 P.3d 977, 995 (App. 2008); *see also Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 157 Ariz. 411, 422, 758 P.2d 1313, 1324 (1988).

**¶36**　　The plaintiff can present either direct evidence or evidence that the defendant's conduct was so oppressive, outrageous, or intolerable such that an evil mind can be inferred. *Gurule v. Ill. Mut. Life & Cas. Co.*, 152 Ariz. 600, 602, 734 P.2d 85, 87 (1987). When the wrongdoer is conscious of the harm posed by his tortious conduct, but continues to act in the same manner in deliberate contravention to the victim's rights, punitive damages are appropriate to punish the wrongdoer and deter others from acting in the same manner. *Newman v. Select Specialty Hosp.-Ariz., Inc.*, 238 Ariz. 59, 63, ¶ 11, 356 P.3d 345, 349 (App. 2015). We will affirm the award if any reasonable view of the evidence would satisfy the clear and convincing standard. *Hyattt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132, 907 P.2d 506, 518 (App. 1995).

**¶37**　　Here, Mr. Winski committed outrageous conduct with the requisite evil mind that supports the punitive damages award. The record shows that Mr. Winski consciously disregarded the Helals' rights under the settlement agreement with M&I. Instead of looking for potential investors for the Helals to help them refinance their loans, Mr. Winski was working with M&I to purchase the notes directly from the bank for his own benefit. Although the Winskis claim that the Helals came to Mr. Winski to find an investor to buy their notes and deeds of trust from M&I, the evidence shows that the Helals' purpose for reaching out to potential investors—since October 2010 when the M&I representative contacted them to resolve their default—was to finance their loans and keep their properties. No evidence in the record show that the Helals were looking to sell their properties. Even though Mr. Winski knew that his action was contrary to the Helals' interests, he continued to act in the same manner in deliberate contravention to the Helals' rights.

**¶38**　　Moreover, the record shows that Mr. Winski had a motive to defraud the Helals to secure benefits for him and his company. Mrs. Lohse contacted Mr. Winski specifically as a personal favor to the Helals to find them a mortgage broker for financing purposes. Mr. Winski repeatedly asked the Helals for information—personal information regarding themselves and their properties—under the guise that potential investors wanted that information. The Helals obliged and went so far as allowing Mr. Winski and his "investor" to see the properties. Although Mr. Winski

claimed that he did not know about the second settlement agreement and knew only that the first settlement agreement expired on December 22, on January 3, he proceeded to ask the Helals for more information—once again under the guise that he had a potential investor for them.

**¶39** The Winskis present several counterarguments, but the record does not support them. The Winskis argue that the Helals would not have gotten financing because of the existence of judgment creditors on their properties and therefore the Helals' had the limited option of selling their notes and deeds of trust. But contrary to the Winskis' position, the Helals' subsequent Mortgage Quest broker found them a lender within a few days. For the Winskis' other arguments, including that the Helals presented false information in their initial loan application and that they adequately explained the note purchase transaction to the Helals, the record shows that the initial application was merely that, an *initial* application that required "fine tuning" and was merely meant to be a basis for the subsequent application. The record also shows that everyone involved— including the Helals, their lender's representative and Mortgage Quest broker, Mrs. Lohse, and Mr. Winski—understood that the Helals were seeking to refinance their loans. In fact, only at trial did the Winskis assert that the Helals were looking for investors to buy their notes from M&I. Consequently, because the record supports the trial court's finding that Mr. Winski's actions were outrageous and conducted with an evil mind, the court did not err in awarding the Helals punitive damages.

### 5. Trial Court Impartiality

**¶40** The Winskis argue finally that the trial court committed "plain error" by taking on an advocate's role during trial and questioning witnesses extensively. But the Winskis cite no authority that the court's action would constitute error, let alone be a basis for reversal. That "the trial judge is not a mere moderator, but has active duties to perform without partiality to see that the truth is developed, and in his discretion he may ask questions to elicit the material evidence" is well settled. *State v. Mendez*, 2 Ariz. App. 77, 79–80, 406 P.2d 427, 429–30 (1965); *see also* Ariz. R. Evid. 614(b) ("The court may examine a witness regardless of who calls the witness."); *State v. Schackart*, 190 Ariz. 238, 256, 947 P.2d 315, 333 (1997) ("A court . . . may interrogate witnesses as part of its duty to see that the truth is developed."). Here, the record makes clear that the trial court appropriately asked questions to see that the truth was developed. The judge explained to counsel on numerous occasions that as the fact finder, he felt it necessary to gather additional information to assist him in

understanding the case and that counsel was more than welcome to object to any of his questions.

**¶41**      To the extent that the Winskis imply that the court was biased against them, they have not overcome the presumption that trial judges are free of bias and prejudice. *State v. Medina*, 193 Ariz. 504, 510 ¶ 11, 975 P.2d 94, 100 (1999). The Winskis have not proved that the judge had "a hostile feeling or spirit of ill-will, or undue friendship or favoritism, towards one of the litigants." *State v. Cropper*, 205 Ariz. 181, 185 ¶ 22, 68 P.3d 407, 411 (2003). "Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *State v. Henry*, 189 Ariz. 542, 546, 944 P.2d 57, 61 (1997) (internal quotation marks and citation omitted). Here, the record does not reflect impropriety in the substance or tone of the court's questioning. Instead, it shows that the court extensively and impartially considered the parties' positions and entered orders based on the evidence. Consequently, the Winskis have failed to demonstrate bias or prejudice displaying a deep-seated favoritism or antagonism.

### 6. Attorneys' Fees on Appeal

**¶42**      The Winskis request attorneys' fees and taxable costs on appeal pursuant to A.R.S. §§ 12–341 and 12–341.01 and upon compliance with Arizona Rule of Civil Appellate Procedure 21. Because the Winskis are not the successful parties, we deny their request. Because the Helals are the successful party, however, we award them their taxable costs, subject to compliance with Rule 21.

### CONCLUSION

**¶43**      For the foregoing reasons, we affirm.



Ruth A. Willingham · Clerk of the Court
FILED: ama

15