NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SHAWN C. FULLER, *Plaintiff/Appellee,*

*v.*

CITY OF SCOTTSDALE, et al., *Defendants/Appellants.*

No. 1 CA-CV 24-0785

FILED 01-15-2026

Appeal from the Superior Court in Maricopa County
No. CV2020-052874
The Honorable Frank W. Moskowitz, Judge

**AFFIRMED IN PART; VACATED IN PART**

COUNSEL

Dickinson Wright PLLC, Phoenix
By Scot L. Claus, Vail C. Cloar, Holly M. Zoe, Alexandra Crandall
*Counsel for Defendants/Appellants City of Scottsdale and Sherry Scott*

Carden Livesay, LTD., Mesa
By Joshua W. Carden
*Counsel for Plaintiff/Appellee*

League of Arizona Cities and Towns, Phoenix
By Nancy L. Davidson
*Counsel for Amicus Curiae League of Arizona Cities and Towns*

Ballard Spahr LLP, Phoenix
By David J. Bodney, Matthew E. Kelley
*Counsel for Amici Curiae Arizona Media Association; KPNX-TV Channel 12,*
*a Division of Multimedia Holdings Corp.; NW Communications of Phoenix, Inc.*
*d/b/a KSAZ-TV; Phoenix Newspapers, Inc.; and Scripps Media, Inc. d/b/a*
*KNXV-TV*

---

**MEMORANDUM DECISION**

Presiding Judge D. Steven Williams delivered the Court's decision, in which Judge Andrew M. Jacobs and Judge Michael S. Catlett joined.

---

**W I L L I A M S**, Judge:

**¶1**        The City of Scottsdale ("the City") and Sherry Scott (collectively, "the Defendants") appeal the superior court's judgment for Shawn Fuller on his wrongful termination and defamation claims following a jury trial. For reasons that follow, we affirm the jury's wrongful termination verdict and damages award but vacate its defamation verdict and damages award.

## FACTUAL AND PROCEDURAL BACKGROUND

**¶2**        In September 2019, the City hired Fuller as its City Prosecutor. A week later, Scott, a long-time City employee, was hired as the City Attorney. Over the next several weeks, Fuller raised concerns about the City's handling of several criminal cases before he was hired—specifically the City's resolution of DUI prosecutions through plea agreements without disclosing blood test results, some of which were exculpatory.

**¶3**        In December 2019, Scott hired outside counsel, Mary Cronin, to investigate Fuller. In January 2020, Scott suspended Fuller pending the results of the investigation. In February, Scott fired Fuller, stating in a letter of dismissal she had "lost trust and confidence" in his ability to lead the prosecutor's office ("the office").

**¶4**        At the February termination meeting, Fuller declined Scott's invitation to resign and instead requested a written report detailing Cronin's investigation and findings. Fuller promptly submitted a notice of claim to the City. In March 2020, the City released Cronin's undated, written report ("the Cronin Report") to the media in response to a public records request.

¶5        Fuller sued the Defendants alleging wrongful termination, defamation, and tortious interference with a business expectancy. Claiming "whistleblower" status, he asserted Scott fired him under false pretenses to protect the City from civil liability for its failure to disclose exculpatory evidence in criminal cases. Fuller also alleged the Defendants defamed him through their public dissemination of false statements contained in the Cronin Report and that the release of the report to the media caused a potential employer to rescind its conditional job offer to him.

¶6        During the ensuing sixteen-day jury trial, held in April and May 2024, the parties presented conflicting evidence concerning the events precipitating Fuller's firing. At the close of evidence, the Defendants moved for judgment as a matter of law on all claims under Arizona Rule of Civil Procedure ("Rule") 50. The superior court entered judgment in the Defendants' favor only on Fuller's claim for tortious interference with business expectancy, submitting his remaining claims to the jury. The jury then returned general verdicts with special interrogatories, finding: (1) the Defendants wrongfully terminated Fuller; (2) Fuller sustained damages of $1,400,694 in lost earnings and benefits and decreased earning power or capacity from his wrongful termination; (3) the Cronin Report contained two defamatory statements; (4) both Scott and the City acted with knowledge the two statements were false, or with reckless disregard as to whether the statements were false; and (5) Fuller sustained damages of $3,500,000 in pain and suffering (past, present, and future) and $350,000 in reputational harm from the Defendants' publication of the defamatory statements.

¶7        The superior court denied the Defendants' motion for new trial and entered a final judgment awarding Fuller damages of $5,250,694 and taxable costs. The Defendants timely appealed. We have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12-120.21 and -2101(A)(1).

## DISCUSSION

### I.        There Was Sufficient Evidence in the Record to Support the Jury's Verdict for Fuller on His Wrongful Termination Claim.

¶8        The Defendants argue Fuller failed to put forward evidence to support his wrongful termination claim. They contend the superior court therefore erred in denying their motion for judgment as a matter of law as to that claim.

### A. Governing Law

**¶9** "We review *de novo* the denial of a motion for judgment as a matter of law." *Desert Palm Surgical Group, P.L.C. v. Petta*, 236 Ariz. 568, 578, ¶ 25 (App. 2015). "Such a motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id.* (citation modified). "In making this determination, we view the evidence in a light most favorable to upholding the jury verdict, and will affirm if any substantial evidence exists permitting reasonable persons to reach such a result." *Id.* (citation modified).

**¶10** Fuller brought his wrongful termination claim under the Arizona Employment Protection Act ("the Act"), A.R.S. § 23-1501. The Act authorizes a cause of action if an employer terminates an employee in retaliation for the employee's disclosure that the employer or its employees have violated Arizona's Constitution or statutes. A.R.S. § 23-1501(A)(3)(c)(ii). To withstand a motion for judgment as a matter of law on a retaliation claim under the Act, a plaintiff must present evidence establishing three elements: (1) the plaintiff had information or a reasonable belief the employer violated Arizona law; (2) the plaintiff disclosed, in a reasonable manner, the alleged violation to the employer or an employee who was in a position to investigate and/or stop the violation or an employee of a public body or a political subdivision of the State; and (3) the employer terminated the plaintiff's employment because of the disclosure. *See id.*

### B. The Parties' Respective Cases

**¶11** Fuller's retaliation case centered around his exposure of the City's prior practice of securing DUI guilty pleas without disclosing the (sometimes exculpatory) results of the defendants' blood-draw laboratory tests. To support his wrongful termination claim, Fuller put forward testimony and exhibits demonstrating that:

> (1) under the policies maintained by his predecessor, who resigned in February 2019, City prosecutors, in multiple cases, secured guilty pleas from defendants charged with driving under the influence ("DUI") before obtaining—and without subsequently disclosing—the results from those defendants' blood-draw laboratory tests;

(2) after the predecessor's resignation, interim-acting City Prosecutor Valerie Thomsen implemented a policy precluding prosecutors from securing guilty pleas in DUI cases before obtaining and disclosing the defendants' laboratory test results;

(3) on his first or second day in the office, an assistant City prosecutor notified Fuller of the office's potential disclosure violations under his predecessor;

(4) upon learning of the potential disclosure violations, Fuller initiated an audit of DUI guilty pleas secured by the office during the preceding five years – the length of time the office retains its case files;

(5) the audit, spearheaded by Thomsen, uncovered nine cases in which defendants pled guilty to DUI despite undisclosed blood test results reflecting the absence of any intoxicating substances in their blood;

(6) in one of those cases, the City obtained the exculpatory blood test results before the defendant pled guilty and in another the City obtained the results before the defendant was sentenced;

(7) presented with the results of the audit, Fuller instructed two assistant prosecutors to file motions with the City Court disclosing the exculpatory information and asking the Court to appoint counsel to evaluate the significance of the laboratory test results;

(8) during the audit (completed on November 5, 2019) and corresponding motion practice, Fuller provided Scott with status updates, and she largely deferred to his decision-making: "I am trusting your judgement on this";

(9) the City Court's judges notified the State Bar of the nine disclosure violations, prompting a State Bar investigation of Fuller, as the head of the office;

(10) Scott hired outside counsel, Rob Ellman, to advise on the State Bar inquiry;

(11) undeterred by the office's limited case file retention period, Thomsen told Fuller she discovered that the State Crime Lab had a longer retention schedule, allowing further review;

(12) Fuller informed Scott and Ellman of the opportunity for an expanded audit, telling them he "fe[lt] strongly" the office needed to review the State Crime Lab's documents, but Scott instructed Fuller to "hold off";

(13) an assistant prosecutor alerted Fuller to a local news story recounting a Phoenix resident's struggle to defend against DUI charges despite laboratory test results reflecting no intoxicating substances in his blood at the time of his arrest, highlighting the substantial legal fees incurred by the defendant before the Phoenix prosecutor's office dropped the charges;

(14) despite Scott's admonition to "hold off," the news story convinced Fuller the audit "needed to go back further than five years";

(15) Scott suspended and fired Fuller before he could pursue an expanded audit;

(16) Fuller suffered substantial economic loss from his termination, quantified by his expert as damages of either $1,826,297 or $1,400,694 using different valuation methods; and

(17) on February 28, 2020, the State Bar dismissed the complaint against Fuller.

¶12 The Defendants, for their part, presented evidence that:

(1) the acting City Attorney before Scott assumed her post, Joseph Padilla—who remained employed by the City after Scott was hired as City Attorney—learned, independent of Fuller, the office "had been withholding exculpatory evidence from criminal defendants";

(2) when Scott learned of the potential disclosure violations, she supported Fuller's audit of the case files and deferred to his judgment in addressing the matter;

6

(3) Scott conveyed to Fuller and Ellman her willingness to substitute for Fuller as the named party in the State Bar investigation, but Ellman elected not to request the substitution;

(4) Scott became concerned about Fuller's management of the office when she attended an office holiday party on December 24, 2019, and noticed that employees seemed nervous and upset, with some privately reporting Fuller had publicly chastised assistant prosecutor Natalie La Porte "in an aggressive fashion" that morning;

(5) when Scott asked Fuller about his reported flare-up with La Porte, he characterized it as a mere "miscommunication," which Scott found wholly incongruent with her observation of the "mood" of the office;

(6) Scott interviewed several office employees between December 26, 2019 and January 3, 2020, receiving numerous reports that Fuller: assigned Thomsen and the office manager many of his duties and did not carry a caseload, instituted "sweeping changes" to the office without understanding how the office operated, focused considerable (often negative) attention on La Porte, discounted the opinions of assistant prosecutors, made demeaning comments about the City's homeless population, and tasked female employees with cleaning the office kitchen and a bookcase;

(7) troubled by these reports, Scott hired Cronin to investigate Fuller, expressing her concerns that he had engaged in bullying, gender-based harassment, and a dereliction of duties;

(8) at Scott's request, Cronin orally presented her investigative findings at the termination meeting, stating Fuller: had engaged in gender discrimination and harassment in violation of the City's values, would likely engage in unlawful gender discrimination and harassment if permitted to remain in his position, had treated subordinates with disrespect, had spoken in a demeaning manner about the City's homeless population, and had created a "toxic work environment";

7

(9) at the termination meeting, Padilla told Fuller that the written investigative report concerning his predecessor had been released to the media via a public records request and warned that demanding written findings would likely result in the public dissemination of the Cronin Report;

(10) despite Padilla's warning, Fuller insisted on receiving a written report and Scott asked Cronin to reduce her findings to writing; and

(11) the Cronin Report constituted the City's official findings.

### C. Applying Fuller's Proofs to the Statutory Elements of Wrongful Termination

¶13 The Defendants argue that Fuller failed to establish all three components of a wrongful termination prima facie case under A.R.S. § 23-1501(A)(3)(c)(ii). We examine each statutory element in turn.

¶14 First, we consider whether Fuller made a qualifying "disclosure" under the Act. The parties do not dispute that Fuller told Scott he believed the office had an obligation to search its retained case files *and* the State Crime Lab's documents to uncover any undisclosed exculpatory laboratory test results. According to the Defendants, these communications did not constitute "disclosures" for purposes of the Act because the City already knew that under Fuller's predecessor, prosecutors had engaged in a practice of securing guilty pleas before receiving and disclosing defendants' laboratory test results. In fact, independent of Fuller, the office had taken corrective action to prevent future nondisclosures. While the City undoubtedly had been apprised of the pattern of nondisclosures in the office before Fuller broached the issue with Scott, nothing in the record suggests the City had contemplated, before Fuller's statements, a legal obligation to uncover its past—but ongoing—disclosure violations concealed in office case files or State Crime Lab documents.

¶15 Second, the Defendants dispute that Fuller had information or a reasonable belief the City violated Arizona law. Specifically, the Defendants argue that Arizona law did not compel them to scour government files and documents for *potentially* exculpatory evidence, and Fuller failed to sufficiently tether his *belief* that the office was required to do so "to any legal or constitutional requirement."

¶16 On review, we consider only whether Fuller presented substantial evidence that *he reasonably believed* the City violated the Arizona

Constitution or Arizona statutes. *State v. Stroud*, 209 Ariz. 410, 411, ¶ 6 (2005). "In its ordinary civil context, 'substantial evidence' is simply relevant evidence from which a reasonable mind might draw a conclusion." *In re Mustonen's Estate*, 130 Ariz. 283, 285 (App. 1981).

**¶17** The Arizona Constitution, like its federal counterpart, guarantees criminal defendants due process of law. Ariz. Const. art. 2, § 4 ("No person shall be deprived of life, liberty, or property without due process of law."). This due process provision imposes an affirmative duty on the State to disclose evidence favorable to the accused. *State v. Schreiber*, 115 Ariz. 555, 556 (1977) (concluding a "prosecutor's nondisclosure of material evidence" denied a defendant "due process of law" under both the Arizona and federal constitutions).

**¶18** Whether willful or inadvertent, the State's failure to disclose material, exculpatory evidence violates a defendant's due process rights. *Milke v. Mroz*, 236 Ariz. 276, 280, ¶ 6 (App. 2014). Importantly, the State's disclosure obligations do not end with a conviction but "continue until all challenges to the conviction have been exhausted." *Id.* at 283, ¶ 16. Indeed, the State bears both "an ethical and [a] constitutional obligation to disclose clearly exculpatory material that comes to its attention after [] sentencing has occurred." *Canion v. Cole* (*Canion II*), 210 Ariz. 598, 599, ¶ 8 (2005).

**¶19** Although Fuller primarily invoked the ethical rules when discussing the State's disclosure obligations, the Defendants do not meaningfully contest that he also maintained the City's nondisclosures constituted *Brady* violations, a shorthand clearly implicating both federal and State constitutional due process protections. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) (construing the federal constitution's due process provision as requiring the State to disclose all material, exculpatory evidence); *Schreiber*, 115 Ariz. at 556 (applying the *Brady* standard to find a prosecutor's nondisclosure of material evidence deprived the defendant of his right to due process under the State constitution). Notably, Ellman also employed this shorthand to describe the disclosure violations in his communications with the State Bar on the City's behalf. Thus, contrary to the Defendants' contention, Fuller's disclosures sufficiently notified Scott that *he believed* the City had violated Arizona law. *See Seballos v. Freeport-McMoRan,Inc.*, 1 CA-CV 22-0079, 2023 WL 5624716, at *3, ¶ 14 (Ariz. App. Aug. 31, 2023) (mem. decision) ("[N]othing in [A.R.S.] § 23-1501(A)(3)(c)(ii) requires an employee to identify to an employer a specific constitutional provision or statute at the time of the disclosure. But the information an employee discloses must convey to the employer conduct that violates a state constitutional or statutory law in enough detail to alert the employer

of the perceived statutory or constitutional violation."). Having found the record contains relevant evidence that Fuller conveyed a reasonable belief the City violated the Arizona Constitution, we must affirm the jury's verdict.

**¶20** Third, the Defendants argue that Fuller failed to present evidence demonstrating Scott fired him because of his disclosures. They contend overwhelming evidence established that Scott had legitimate reasons for firing Fuller, wholly unrelated to the disclosure violations. Moreover, the Defendants assert that Fuller's claim of retaliatory discharge "defies all logic" because "the *Brady* issue had already been exposed publicly to the affected defendants, judges, and the State Bar."

**¶21** To establish the causation element, an employee must show that retaliation was a substantial motivating factor for the dismissal. *Czarny v. Hyatt Residential Mktg. Corp.*, 1 CA-CV 16-0577, 2018 WL 1190051, at *3, ¶ 17 (Ariz. App. Mar. 8, 2018) (mem. decision). Because retaliation need not be the sole motivating factor, evidence that the employer considered other bases for terminating the employee does not defeat a claim of retaliatory discharge. *Id.*

**¶22** Here, the uncontroverted evidence established that Scott: (1) largely deferred to Fuller's judgment in handling the audit of the office's case files as well as the corresponding notifications filed in City Court; (2) hired an ethics attorney to advise and represent Fuller in the State Bar's investigation; and (3) offered to substitute for Fuller in the State Bar inquiry. On this record, none of Scott's actions with respect to the audit of the office's case files supports a claim of retaliatory discharge.

**¶23** The record also reflects, however, that: (1) Scott instructed Fuller to "hold off" when he told her the audit could be expanded by searching the State Crime Lab's documents for *Brady* violations; (2) Scott suspended Fuller close in time to his stated intent to expand the audit (albeit given the short duration between Fuller's start date and suspension date, all events arguably occurred close in time); (3) Scott conveyed to Ellman her desire to shield Fuller's predecessor from any public scrutiny arising out of the disclosure violations; and (4) after Fuller's firing, the Defendants did not pursue an expanded audit. *See Czarny*, 1 CA-CV 16-0577, at *3, ¶ 18 (holding the timing of a termination decision in relation to the disclosure may create a genuine issue of fact as to whether a firing was retaliatory).

**¶24** In addition, Fuller elicited expert testimony characterizing Cronin's investigation as objectively unreasonable—criticizing Cronin for

using leading questions, "putting words in people's mouths," failing to disclose the scope of the investigation, sharing her own opinions of Fuller with interviewees, and disclosing among interviewees what others had reported. Fuller also presented his own conflicting account of the *stated* reasons for his suspension and termination.

¶25 For example, Fuller testified he adamantly denied allegations of gender discrimination and harassment presented by Scott at the suspension meeting—declaring his belief that Scott manufactured the claims to retaliate against him for "blow[ing] the whistle" on the City's conduct—leading Scott to immediately withdraw the allegations. According to Fuller, Scott responded: "Well, we will just take that off of the table." Scott, on the other hand, testified that Fuller became angry after she informed him of the gender discrimination and harassment allegations at the suspension meeting, prompting her to say, "let's put that aside," so they could discuss other complaints.

¶26 Fuller also testified that at the outset of the termination meeting, he inquired about the allegations of gender discrimination and harassment Scott had put forward at the suspension meeting and Scott told him that Cronin had reached *no conclusions* concerning those allegations other than finding if Fuller remained in his position, he would likely engage in discrimination and harassment eventually. By contrast, Scott testified that the bases for dismissal proffered at the termination meeting were entirely consistent with those outlined in the Cronin Report, explaining Fuller simply "wasn't listening" and "wasn't willing to accept" that although he had *not* committed *unlawful* gender discrimination or harassment, he had nonetheless treated employees differently based on their gender in violation of the City's values.

¶27 Given the contradictory accounts of the stated reasons for Fuller's suspension and termination, a jury could have reasonably concluded Fuller's disclosure concerning the State Crime Lab documents was among the factors motivating his dismissal.

¶28 In sum, Fuller established a prima facie case of wrongful termination under A.R.S. § 23-1501(A)(3)(c)(ii). Although the Cronin Report outlined facially valid reasons for his termination, Fuller put forward substantial evidence to refute those stated reasons as pretextual. *Czarny*, 1 CA-CV 16-0577, at *3, ¶ 17 (explaining an employee must present "specific" and "substantial" evidence of pretext but may rely on direct or circumstantial evidence). Because the conflicting evidence created a genuine dispute of material fact warranting a jury determination, the

superior court did not err by denying the Defendants' motion for judgment as a matter of law and submitting the wrongful termination claim to the jury.

## II.  Fuller's Failure to Identify Before Trial Specific Statements That Defamed Him Requires Vacating the Defamation Verdict.

**¶29**        The Defendants raise several challenges to the defamation verdict, but one is dispositive. The Defendants assert the superior court erred in submitting Fuller's defamation claim to the jury despite his failure to identify *before and during trial* the specific statements he contended were defamatory. We agree.

**¶30**        Without referencing any particular statement in the Cronin Report, Fuller broadly alleged in his complaint that the Defendants "wrote, or republished to third parties statements of fact about [him] that were false," "including but not limited to statements that [he] had engaged in gender discrimination." While Rule 8(a)(2) simply requires that a complaint contain, among other things, a "short and plain statement of the claim showing that the pleader is entitled to relief," Fuller also had a "continuing duty" to disclose "the factual basis of each of [his] claims." Ariz. R. Civ. P. 26.1(a)(1), (f)(2). Indeed, as "litigation progresses, [] a party must timely disclose the factual basis of a party's claims or defenses and 'the legal theory on which each' claim or defense is based." *Reyes v. Town of Gilbert*, 247 Ariz. 151, 159, ¶ 30 (App. 2019) (quoting Ariz. R. Civ. P. 26.1(a)(1)-(2)).

**¶31**        During discovery, the Defendants requested Fuller "[i]dentify each and every statement upon which [he] base[d] [his] defamation claim," including "what was said, who said it, [and] when it was said." Fuller failed to do so. Instead, he responded by pointing to the Cronin Report and asserting that "false factual statements about [his] behavior [can be found] on every one of its 13 executive summary pages and its 21 report pages." Fuller's refusal to identify what specific statements defamed him was nothing more than a game of hide the ball.

**¶32**        But "[d]isclosure, like all discovery, is not a game." *Bryan v. Riddel*, 178 Ariz. 472, 477 (1994). "It should have as its goal the preparation of cases for trial or settlement." *Id*. And while the object of disclosure "is to permit the opponent a reasonable opportunity to prepare for trial . . . nothing more, nothing less," *id*. at 476, n.5, Fuller's refusal left the Defendants in the unenviable and unreasonable position of defending against an unquantified number of unqualified statements contained somewhere within the Cronin Report. That cannot be.

¶33        In their reply brief in support of their motion for summary judgment, the Defendants argued Fuller had failed to establish a requisite element of his defamation claim by failing to identify any specific statement he alleged as defamatory, noting he had refused their repeated disclosure requests, both in their interrogatories and at his deposition. The superior court denied the Defendants' motion without addressing this argument.

¶34        But the difficulty was further compounded by Fuller's failure to identify specific defamatory statements in the Joint Pretrial Statement, prompting the Defendants' Rule 37 motion urging the superior court to preclude Fuller from asserting any statements at trial not identified during discovery as defamatory. Ariz. R. Civ. P. 37(c)(1) ("Unless the court specifically finds that such failure caused no prejudice or orders otherwise for good cause, a party who fails to timely disclose information . . . may not use the information . . . as evidence at trial[.]").

¶35        At the final trial management conference, the superior court addressed the Defendants' Rule 37 motion, noting some Cronin Report statements not "relevant for the defamation claim" were nonetheless relevant to the wrongful termination claim and instructing defense counsel simply to object if Fuller "start[ed] talking about all this defamatory stuff that wasn't disclosed." Defense counsel balked, explaining: "[W]hen this is an element of your claim, what is the defamatory statement, I think the Court is bound to hold the plaintiff to the strict disclosure of the defamatory statement and we can't have an expansion of additional statements that weren't previously advised because our defense is truth." In response, the court reiterated: "[I]f no one objects, I'm just going to sit here and I'm not going to do anything about it. . . . [I]f it's a disclosure issue, stop the case . . . and object and we'll deal with the disclosure issue at that time." At that point, defense counsel agreed to "table the Rule 37 motion" until "a Rule 50" motion.

¶36        At trial, the Defendants continued to argue Fuller had not complied with the disclosure requirements by failing to identify any specific defamatory statements. In response, the superior court repeatedly asked Fuller's attorney to clarify precisely which Cronin Report statements defamed him—but to no avail. Fuller testified during his presentation of evidence that the Cronin Report falsely stated he engaged in gender discrimination and harassment. He also testified that these allegedly false statements impugned his reputation and hurt his family. But in so testifying, neither Fuller nor his attorney pointed to any specific Cronin Report statement.

¶37        Following Fuller's presentation of evidence, the Defendants moved for judgment as a matter of law on the defamation claim, referencing their Rule 37 motion and again asserting Fuller had failed to specify which statements "underlie the defamation claim": "[I]f [Fuller] still can't articulate [the alleged defamatory statements], then we're entitled to Rule 50 relief." The superior court denied the Defendants' Rule 50 motion, but later acknowledged that Fuller had not disclosed any specific defamatory statements when addressing the Defendants' renewed motion for judgment as a matter of law, as reflected in the following exchange with counsel:

> Defense Counsel: Your Honor, if I may? We are now at the close of evidence arguing over the defamatory statement. This is so unfair.
>
> Court: Well, I didn't have a motion for summary judgment on it, did I?
>
> Defense Counsel: Oh, absolutely you did. You absolutely - -
>
> Court: Where in the motion for summary judgment did it say that these specific statements were not defamatory? *I don't even think you knew the statements to tell me.*
>
> Defense Counsel: *That's my point.* We had interrogatories. We had - -
>
> Court: *Right. But I was never presented with these are the alleged defamatory statements.* They are not defamatory as a matter of law.
>
> Defense Counsel: *You are absolutely correct*, because what we got was what he said in his deposition, which are not these…

(Emphasis added). Despite recognizing Fuller's failure to identify any specific statements as defamatory, the superior court denied the Defendants' renewed Rule 50 motion.

¶38        To defeat a motion for judgment as a matter of law on a defamation claim, a public figure plaintiff must put forward evidence that: (1) the defendant *made a false statement* about the public figure, (2) *the statement is defamatory*, (3) the defendant published *the statement* to a third party, (4) the defendant acted with actual malice, and (5) the public figure suffered damages as a result. *See Harris v. Warner*, 255 Ariz. 29, 32, ¶ 11

(2023). "[C]onclusory statements are insufficient to state a claim upon which relief can be granted." *BLK III, LLC v. Skelton*, 252 Ariz. 583, 588, ¶ 15 (App. 2022) (quoting *Cullen v. Auto-Owners Ins. Co.*, 218 Ariz. 417, 419, ¶ 7 (2008)). "This is especially true in a defamation action because the context and language of an allegedly defamatory statement is crucial" to determine whether a plaintiff has established a prima facie case. *See id.* Without knowing "the precise language" of an allegedly defamatory statement, "the court cannot analyze whether the statement is objectively verifiable as true or false—a critical question in determining whether a defamation action may lie." *Id.*

**¶39**  Here, Fuller refused to obey Rule 26.1's requirements—he refused to disclose which statements defamed him; failed to answer discovery calculated to obtain the answer; failed to identify the same in the Joint Pretrial Statement; and failed to identify any alleged defamatory statement until the court required him to do so at the close of evidence at trial. Fuller's actions and inactions deprived the Defendants of any "reasonable opportunity" to defend themselves against Fuller's stealthily amorphous trial on the defamation claim. *See Bryan*, 178 Ariz. at 476, n.5.

**¶40**  Given Fuller's refusal to identify statements for the superior court's consideration until after the close of evidence, the Defendants were entitled to judgment as a matter of law on the defamation claim. *See Desert Palm Surgical Group*, 236 Ariz. at 578, ¶ 25. For these reasons, we vacate the defamation verdict and resulting damages award.

## CONCLUSION

**¶41**  We vacate the defamation verdict, and corresponding portion of the judgment. We otherwise affirm.



MATTHEW J. MARTIN • Clerk of the Court
**FILED**:        JR